**RED LION BROADCASTING CO., Inc.,**
et al., Petitioners,

v.

**FEDERAL COMMUNICATIONS COM-
MISSION and United States of
America, Respondents.**

**No. 19938.**

United States Court of Appeals
District of Columbia Circuit.

Argued Sept. 26, 1966.

Decided June 13, 1967.

Mr. Robert E. Manuel, Washington, D. C., with whom Mr. Thomas B. Sweeney, Washington, D. C., was on the brief, for petitioners.

Mr. Henry Geller, Gen. Counsel, F. C. C., with whom Asst. Atty. Gen. Turner, Messrs. John H. Conlin, Associate Gen. Counsel, Robert D. Hadl, Counsel, F. C. C., and Howard E. Shapiro, Atty., Dept. of Justice, were on the brief, for respondents. Mrs. Lenore G. Ehrig, Counsel, F. C. C., also entered an appearance for respondent Federal Communications Commission.

Before WILBUR K. MILLER, Senior Circuit Judge, and FAHY* and TAMM, Circuit Judges.

The action of the Federal Communications Commission is affirmed. Circuit Judge Tamm files an opinion. Circuit Judge Fahy files a separate opinion. Senior Circuit Judge Miller notes his non-participation in the consideration and decision of the case on the merits.

* Circuit Judge Fahy became Senior Circuit Judge on April 13, 1967.

TAMM, Circuit Judge:

*I. Earlier Proceedings in This Court.*

Argument of this case, after a full briefing schedule, was conducted before this panel of the court on September 26, 1966. With Judge Fahy dissenting, the panel concluded that the "declaratory rulings contained in the Commission's letters are not orders from which an appeal may be taken or judicial review sought," and dismissed petitioners' action. Thereafter, the United States and the Federal Communications Commission petitioned for an en banc rehearing of the case, and a majority of the court voted in favor of the granting of this petition to rehear. A majority of the court, then en banc, voted to vacate the opinions and judgment filed by the panel on November 22, 1966, and directed the assigned division to consider the petitioners' action upon the merits.[1]

*II. The Issues Presented.*

A prehearing stipulation approved by the court in a prehearing order dated March 9, 1965, defined the issues agreed to by the parties to be:

1. Whether section 315 of the Communications Act of 1934, as amended in 1959,[2] adopted the Commission's "Fairness Doctrine" as set forth in the Commission's 1949 *Report, Editorializing by Broadcast Licensees*,[3] and if so, whether section 315 constitutes an unconstitutional delegation of Congress' legislative function.

2. Whether the Fairness Doctrine, as set forth above, is unconstitutionally vague, indefinite, uncertain and lacks the precision required when legislation which affects the basic freedoms guaranteed by the Bill of Rights is adopted.

3. Whether section 315, as stated in (1) above, violates the ninth and tenth amendments to the Constitution.

4. Whether the Fairness Doctrine violates the first and fifth amendments to the Constitution and, particularly, whether under the facts of this case the requirement that a broadcaster may not insist upon financial payment by a party responding to a personal attack violates the first and fifth amendments to the Constitution.

*III. Identity of Petitioners and Factual Background Creating the Present Controversy.*

Petitioners are Red Lion Broadcasting Co., Inc., the licensee of Radio Station WGCB–AM–FM, Red Lion, Pennsylvania, and the Reverend John M. Norris, the principal stockholder and president of Red Lion Broadcasting Co., Inc. In November 1964, petitioners broadcast a fifteen minute program by a Reverend Billy James Hargis as part of a program series entitled, *The Christian Crusade*. The program included a discussion of the 1964 presidential election and a book concerning the Republican campaign entitled, *Goldwater—Extremist on the Right*, written by Mr. Fred J. Cook. During the course of the program and as part of the broadcast, Reverend Hargis made the following statements concerning Mr. Cook.

"Now who is Cook? Cook was fired from the New York World-Telegram after he made a false charge publicly on television against an unnamed official of the New York City government. New York publishers and Newsweek magazine for December 7, 1959, showed that Fred Cook and his pal Eugene Gleason had made up the whole story and this confession was made to the District Attorney, Frank Hogan. After losing his job, Cook went

---

1. See court order filed with this court's clerk on March 13, 1967.

2. Equal Time Act, 47 U.S.C. § 315 (1962), amending 48 Stat. 1088 (1934).

3. Report of the Commission in the Matter of Editorializing by Broadcast Licensees. 13 F.C.C. 1246 (1949).

to work for the left-wing publication, *The Nation* * * *. Now among other things, Fred Cook wrote, for *The Nation* was an article absolving Alger Hiss of any wrong doing * * there was a 208 page attack on the FBI and J. Edgar Hoover; another attack by Mr. Cook was on the Central Intelligence agency * * * now this is the man who wrote the book to smear and destroy Barry Goldwater called *Barry Goldwater—Extremist Of The Right.*"

Thereafter, Fred J. Cook wrote a letter to Radio Station WGCB inquiring whether Reverend Hargis had, in fact, made the above remarks. Cook requested time to reply to the Hargis remarks if they had, in fact, been made and specifically requested that the reply time be furnished at the expense of WGCB. In response, WGCB furnished Cook with its rate card so that he could arrange for the time he might wish to purchase and furnished him copies of letters which it had written in answer to comparable requests by the Democratic National Committee and the American Civil Liberties Union. A further exchange of letters occurred, after which, Cook filed a complaint with the Federal Communications Commission. In his complaint, Cook charged that Radio Station WGCB had broadcast a personal attack against him without notifying him of the attack or sending him a transcript of the program. Cook also charged WGCB was insisting upon payment from him for any reply broadcast. The Commission brought the complaint to the attention of Radio Station WGCB and requested an answer within twenty days. As a result of this letter, additional letters were exchanged between the radio station and the Commission. To permit a full understanding of the resulting controversy, the pertinent letters are quoted below in their entirety as they were reproduced in the Joint Appendix filed by the parties in this case.

"AM WGCB FM
BOX 88
RED LION, PENNA.
May 19, 1965

Mr. Ben Waple Secretary
Federal Communications
 Commission
Washington, D. C.

In re: Complaint of Mr. Fred J.
 Cook; Your ref. #8425–A

Dear Sir:

Under date of March 22, 1965, you wrote us in regard to a complaint from Mr. Fred J. Cook, Interlaken, New Jersey, alleging that he had been refused free broadcast time on our station WGCB to rebut an alleged personal attack made upon him in late November over the Billy James Hargis Program. You have requested that we comment on this complaint.

The Billy James Hargis broadcast to which Mr. Cook apparently refers was carried on this station on November 27, 1964. We received a letter from Mr. Cook dated December 19, 1964, to which we replied on December 28, 1964. A further letter dated December 31, 1964, was received from Mr. Cook to which we replied on January 7, 1965. Copies of these letters are attached.

It has been our understanding that the Commission's fairness doctrine requires a broadcast licensee to give free time to reply to paid broadcasts only if sponsorship is not available for such reply broadcast. Our communications to Mr. Cook were designed to ascertain whether Mr. Cook was prepared to 'sponsor' or pay for his reply broadcast. Mr. Cook's communications to us, however, have not directly answered our inquiry.

The Commission is hereby advised that WGCB will give Mr. Cook an appropriate amount of time to answer the alleged attack upon him in the Hargis program if he advises us that he is financially unable to 'sponsor' or pay for such a broadcast. We are quite certain that it would be impossible for us to obtain other sponsorship of such a broadcast. If we are incorrect in our proposed meth-

od of disposition of this matter, we will be glad to have the Commission so advise us and we will follow such other procedure as the Commission may suggest.

A copy of this letter is being sent to Mr. Cook for any comment that he might care to make to us or to the Commission.

Very truly yours,

RED LION BROADCASTING COMPANY
REV. JOHN M. NORRIS, *President*"

"FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D. C. 20554

In Reply Refer To: 8427–A

October 6, 1965

Reverend John M. Norris,
President
Red Lion Broadcasting
Company, Inc.
Radio Station WGCB
Post Office Box 88
Red Lion, Pennsylvania

Dear Sir:

This letter refers to a complaint filed with the Commission by Mr. Fred J. Cook of Interlaken, New Jersey, concerning a Billy James Hargis program, 'Christian Crusade', which you broadcast in November, 1964. The program included a discussion of the 1964 presidential election and of a book by Mr. Cook about the Republican campaign. Mr. Cook alleges the discussion included the following personal attack against him:

'Now who is Cook? Cook was fired from the New York World-Telegram after he made a false charge publicly on television against an unnamed official of the New York City government. New York publishers and Newsweek magazine for December 7, 1959, showed that Fred Cook and his pal Eugene Gleason had made up the whole story and this confession was made to District Attorney Frank Hogan.'

Mr. Cook asserts that you failed to notify him of the attack or to furnish him with a transcript of summary either before or after the program was aired, and that you refused his request for free time to respond to the attack.

In your reply to the Commission's inquiry, you said that your understanding of the requirements of the 'fairness doctrine' is that a licensee is not required to grant free time for a reply to a paid broadcast if paid sponsorship is available; and that your letters to Mr. Cook were designed to ascertain whether he was prepared to sponsor or pay for his reply broadcast and, specifically, whether he was financially unable to do so.

The licensee, with the exception of appearances of political candidates, is fully responsible for all matter which is broadcast over his station, including broadcasts containing a personal attack. The latter is defined in our recent fairness primer as an attack '* * * on an individual's or group's honesty, character, integrity, or like personal qualities * * *' in connection with a controversial issue of public importance. See part E, Personal Attack Principle, 'Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance', 29 F.R. 10415, 10420–21. A copy of this document is enclosed.

Where such an attack occurs, the licensee has an obligation to inform the person attacked of the attack, by sending a tape or transcript of the broadcast, or if these are unavailable, as accurate a summary as possible of the substance of the attack, and to offer him a comparable opportunity to respond. Ibid. The licensee may not delegate his responsibilities in this respect to others. Report on 'Living Should Be Fun' Inquiry, 33 FCC 101, 107.

In this case, the program in question contained a personal attack on Mr. Cook, since it asserted that he was fired from his newspaper job because he made false charges against public officials. Your failure to notify Mr. Cook of the attack upon him by Mr. Hargis aired by your station and to offer him the opportunity to reply, was inconsistent with the foregoing procedural requirements.

In the case of a personal attack, the individual or group attacked has the

right to appear. Cullman Broadcasting Co., FCC 63–849, Ruling 16, Fairness Primer. The licensee is, of course, perfectly free to inquire whether the individual is willing to pay to appear. Here Mr. Cook, in his letters of December 19 and 21, 1964, had stated that he was not. The licensee is also free to obtain a sponsor for the program in which the reply is broadcast, or to present the reply on the particular program series involved, if this is agreeable to the parties such as Mr. Cook and Reverend Hargis. But having presented a personal attack on an individual's integrity, honesty, or character, the licensee cannot bar the response—and thus leave the public uninformed as to his side and 'elemental fairness' not achieved as to the person attacked *(Editorializing Report,* Paragraph 10)—simply because sponsorship is not forthcoming. Cf. Cullman Broadcasting Co., *supra.*

In short, the burden was upon you to find sponsorship, if you so desired, for Mr. Cook's reply; nor, in the circumstances, did Mr. Cook have to make any showing or representation that he is financially unable to sponsor or pay for his reply time.

Accordingly, you are requested to advise the Commission of your plans to comply with the 'fairness doctrine', applicable to the situation.

BY DIRECTION OF THE COMMISSION
BEN F. WAPLE
*Secretary*

Enclosure
cc: Fred J. Cook"

"AM WGCB FM

BOX 88
RED LION, PENNA.

November 8, 1965

Mr. Ben Waple,
Secretary
Federal Communications
Commission
Washington, D. C.

In re: Complaint of Fred J. Cook concerning alleged attack by Rev. Billy James Hargis on Station WGCB, Red Lion, Pennsylvania, Ref: 8427–A

Dear Sir:

This is in reference to the Commission's letter on the above matter, dated October 6, 1965, public notice of which was given on October 8, 1965, but the text of which has not been publicly released. The letter was postmarked October 8th and received by us on October 11, 1965.

It is our understanding that by this letter the Commission has directed Red Lion Broadcasting Company to provide Mr. Fred J. Cook with free broadcast time on Station WGCB to answer the alleged personal attack upon him in the Billy James Hargis program broadcast on Station WGCB in November, 1964. The Commission's directive, however, does not indicate by what date Station WGCB is required to put on the broadcast. The Commission has rejected our proposal, stated in our letter of May 19, 1965 to the Commission (copy of which was sent to Mr. Cook and to which we have received no reply from Mr. Cook), making an offer of free time to Mr. Cook upon a simple statement by him that he is unable to pay for such a broadcast. We would appreciate being advised by the Commission as to the time period for complying with the Commission's directive.

We respectfully urge, however, that the Commission reconsider its directive to us. We ask the Commission to refer to the mimeographed 'Statement of Red Lion Broadcasting Company, Inc. (Station WGCB AM-FM, Red Lion, Pa.) In Response to Complaint of Democratic National Committee' transmitted to the Commission under date of March 11, 1965. It will be noted that, in that statement, reference was made to the fact that the Democratic National Committee, in the summer of 1964, sent to Station WGCB a reprint of an article in *The Nation,* a nationwide publication, entitled 'Radio Right: Hate Clubs of the Air', with a warning concerning our alleged obligation to give free time to answer broadcasts by such 'Hate Clubs'. The

article was written by the same Mr. Fred J. Cook who complained about the alleged personal attack upon him in the Hargis program. Mr. Cook, in his article, attacked Billy James Hargis, his program, and his organization, Christian Crusade. It will also be noted that the Democratic National Committee was given thirty minutes of free time on the Twentieth Century Reformation Hour (it had previously been given two fifteen minute segments on this hour) to broadcast a thirty minute taped discussion entitled 'Hate Clubs of the Air.' Nevertheless, WGCB has advised the Commission and Mr. Cook that it would give Mr. Cook free time to reply if he states that he is unable to pay for the time.

Under the circumstances, we are at a loss to see the 'fairness' in the Commission's letter to us of October 6, 1965. The Commission has directed that we give Mr. Cook free time to answer an alleged attack upon him made in a paid broadcast by one who had previously been the subject of a nationwide attack by Mr. Cook despite the fact we have offered Mr. Cook free time upon his statement that he is unable to pay. The Commission has given us no reason why the "Fairness Doctrine" requires an offer of free time to Mr. Cook to be made without condition as to his inability to pay.

We sincerely request that, either by way of reconsideration or clarification of the Commission's directive, we be advised whether in good conscience and in 'fairness,' we should now be forced to give Mr. Cook free time to reply to an attack by one whom he has previously attacked. And, if Mr. Cook, in his reply, should personally attack Mr. Hargis and other 'Hate Clubs', as he calls them, would we then be required to give free time to Mr. Hargis and others whom Mr. Cook may again attack? Or, if Mr. Hargis should then reply to Mr. Cook in his paid broadcast, would we then be required to give Mr. Cook more free time for further reply?

It has been stated in a brief filed in the U. S. District Court for the District of Columbia by the United States and the Federal Communications Commission, in the case of Red Lion Broadcasting Co., Inc. v. Federal Communications Commission et al. (Civil action #2331–65) that the Commission's letter of October 6, 1965 with reference to this matter ' * * * constitutes a final order * * * '. This apparently indicates that we are presently under a mandate from the Commission which, if not complied with, may subject us to revocation, forfeitures and possibly other penalties. It is for this reason that we ask that the Commission reconsider its October 6th ruling, or clarify at the earliest possible date, by way of declaratory ruling, the scope of its directive to us in its letter of October 6, 1965.

In view of other statements in that brief, a ruling by the Commission on the constitutionality of the 'Fairness Doctrine' as applied to the instant situation, is also requested.

Respectfully submitted,

RED LION BROADCASTING COMPANY, INC.
By JOHN H. NORRIS
 John H. Norris, *Vice President"*

"FEDERAL COMMUNICATIONS COMMISSION
WASHINGTON, D. C. 20554
December 9, 1965

In Reply Refer To: 8427–A 11–186
John H. Norris, Vice
 President
Red Lion Broadcasting
 Company, Inc.
Radio Station WGCB
Box 88
Red Lion, Pennsylvania
 17356

Dear Sir:

This is in reference to your request that the Commission reconsider its ruling of October 8, 1965 on the complaint of Mr. Fred J. Cook. We have considered the contentions and adhere to our prior ruling for the reasons given below.

1. Your letter states that Mr. Cook in an article in *The Nation*, entitled 'Radio Right: Hate Clubs of the Air', attacked "Billy James Hargis, his pro-

gram, and his organization * * *'; that your station gave the Democratic National Committee 30 minutes of free time on the Twentieth Century Reformation Hour to broadcast a discussion entitled 'Hate Clubs of the Air'; and that you advised Mr. Cook that you would give him free time to reply to the personal attack upon him 'if he states that he is unable to pay for the time.' In the circumstances, you state that fairness does not require the station to 'give Mr. Cook free time to answer an alleged attack upon him made in a paid broadcast by one who had previously been the subject of a nationwide attack by Mr. Cook * * *.'

We have held that 'the requirement of fairness, as set forth in the *Editorializing Report*, applies to a broadcast licensee irrespective of the position which may be taken by other media on the issue involved; and that the licensee's own performance in this respect, in and of itself, must demonstrate compliance with the fairness doctrine.' *Letter to WSOC Broadcast Co.*, FCC 58–686, Ruling No. 11, 'Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance' (herein called Fairness Primer) 29 F.R. 10415, 10418–19). Thus, the requirement of the statute is that the *licensee* 'afford reasonable opportunity for the discussion of conflicting views on issues of public importance' (Section 315 (a)). This requirement is not satisfied by reference to what other media, such as newspapers or magazines, or indeed other stations have presented on a particular issue. It deals solely with the particular station and what it has broadcast on the controversial issue of public importance. It follows that Mr. Cook's article in *The Nation* does not constitute a ground for absolving the licensee of its responsibility to allow Mr. Cook comparable use of Station WGCB's facilities to reply to the personal attack which had been broadcast.

Nor does the reference to the Democratic National Committee program constitute such a ground. Except for the use of its facilities by legally qualified candidates, the licensee is fully responsible for all matter which is broadcast over its station. Here the licensee, in its presentation of programming dealing with a controversial issue of public importance, has permitted its facilities to be used for a personal attack upon Mr. Cook. Elemental fairness requires that Mr. Cook be notified of the attack and be given a comparable opportunity to reply. You do not claim that the Democratic National Committee program contained such a reply by Mr. Cook to the personal attack made upon him, and therefore that program does not constitute compliance with the fairness doctrine's requirements in the case of Mr. Cook.

As to the contention that you will permit Mr. Cook to air a free response only if he is financially unable to pay, such a position is, we think, inconsistent with the public interest. The licensee has decided that it served the needs and interests of its area to have a personal attack aired over its station; the public interest requires that the public be given the opportunity to hear the other side. The licensee cannot properly make that opportunity contingent upon the payment of money by the person attacked (or the circumstance that he is financially unable to pay). The licensee may, of course, inquire whether the person attacked is willing to pay for airing his response, or take other appropriate steps to obtain sponsorship. See our prior ruling. But if these efforts fail, the person attacked must be presented on a sustaining basis. We believe that this is a matter of both elemental fairness to the person involved and, more important, of affording the public the opportunity to hear the other side of an issue which the licensee has adjudged to be of importance to his listeners. See Cullman Broadcasting Co., FCC 63–849, Ruling No. 17, Fairness Primer.

There are other policy considerations supporting the foregoing conclusion. A contrary position would mean that in the case of a network or widely syndicated

program containing a personal attack in discussion of a controversial issue of public importance, the person attacked might be required to deplete or substantially cut into his assets, if he wished to inform the public of his side of the matter; in such circumstances *reasonable* opportunity to present conflicting views would not, practically speaking, be afforded. Indeed, it has been argued that under such a construction, personal attacks might even be resorted to as an opportunity to obtain additional revenues.

For all the above considerations, we hold that the licensee may inquire about payment, but cannot insist upon either such payment or a showing of financial inability to pay in this personal attack situation. Here Mr. Cook, in his letters of December 19 and 21, 1964, stated that he was not willing to pay to appear.

2. You have raised the question of a continuing chain of personal attacks. This matter is discussed in the enclosed *Letter to the Honorable Oren Harris,* FCC 63–851, p. 5, pointing out that the licensee 'has discretion (except in the case of an appearance of candidates) to review a proposed program, including the script, to insure that it does not go unreasonably far afield as to the issues.' In any event, there is no indication of such a hypothetical chain in the circumstances of this case, nor indeed have you raised any question concerning Mr. Cook's proposed reply except on the ground of payment.

3. You have referred to a statement in the brief filed in the case of Red Lion Broadcasting Co., Inc. v. Federal Communications Commission, et al. (Civil Action No. 2331–65) that the Commission's letter of October 6, 1965 'constitutes a final order * * *', and seeks clarification as to the scope of the directive in that letter, and particularly 'by what date Station WGCB is required to put on the broadcast.' The ruling is a 'final order', in the same sense as a ruling under Section 315 dealing with the 'equal opportunities' provision. As

stated in the enclosed *Letter to the Honorable Oren Harris, supra:*

'* * * the licensee should have the opportunity to contest the validity of any Commission "fairness" ruling. If the Commission rules at the time of complaint, the licensee can, if he believes the ruling incorrect, appeal to the court. Cf. Brigham v. F. C. C., 276 F.2d 828, 829 (C.A. 5); Fadell v. U. S., Case No. 14,142, (C.A. 7); Frozen Foods Express v. U. S., 337 U.S. 426, 432–440; Caples Co. v. U. S., [100 U.S. App.D.C. 126], 243 F.2d 232 (C.A. D.C.); if he wins, he need not comply, while if he loses, he will of course follow the ruling. * * *'

The licensee thus has the choice of complying with the ruling or seeking review thereof. As to the time of compliance, this varies with the factual situation and is a matter to be worked out in good faith and on a reasonable basis by the licensee and the person involved.

4. Finally, you have requested a ruling by the Commission as to the constitutionality of the fairness doctrine, as applied to this situation. We discussed the constitutionality of the fairness doctrine generally in the Report on Editorializing, 13 F.C.C. 1246–1270. We adhere fully to that discussion, and particularly the considerations set out in paragraphs 19 and 20 of the Report.

We believe that the discussion in those paragraphs is equally applicable to our ruling in this case. The ruling does not involve any prior restraint. The licensee is free to select what controversial issue should be covered, and whether coverage of that issue should include a personal attack. The ruling simply requires that if the licensee does choose to present a personal attack, the person attacked must be notified and given the opportunity for comparable response.

The ruling provides that if sponsorship is not forthcoming (see p. 2), the person attacked must be presented on a sustaining basis, because, in line with the above cited discussion in the Editorializing Report the paramount public interest is that the public have the oppor-

tunity of hearing the other side of the controversy, and elemental fairness establishes that the person attacked is the appropriate spokesman to present that other side. Since this personal attack situation is the only area under the fairness doctrine where the licensee does not have discretion as to the choice of spokesmen, the Commission has carefully limited the applicability of the personal attack principle to those situations where there is an attack upon a person's 'honesty, character,' integrity or like personal qualities." See Part E, Personal Attack Principle, Fairness Primer, 29 F.R. 10415, 10420–21. The principle is not applicable simply because an individual is named or referred to, or because vigorous exception is taken to the views held by an individual or group. *Ibid*; see also letter to Pennsylvania Community Antenna Association enclosed.

A broadcaster has sought the license to a valuable public frequency, and has taken it, subject to the obligation to operate in the public interest. Valuable frequency space has been allocated to broadcasting in considerable part, so that it may contribute to an informed electorate. Report on Editorializing, 13 F.C.C. 1246–1270, par. 6. Viewed against these fundamental precepts, our ruling is, we believe, reasonably related to the public interest 'in the larger and more effective use of radio' (Section 303(g) of the Communications Act). Since that is so, it is a requirement fully consistent with the Constitution. NBC v. United States, 319 U.S. 109, [190] 227 [63 S.Ct. 997, 87 L.Ed. 1344].

BY DIRECTION OF THE COMMISSION
BEN F. WAPLE
*Secretary*

Enclosures
cc: Fred J. Cook"

A formal order of the Commission, issued December 10, 1965, recited the addressing of the December 9 letter to the Reverend John H. Norris.

Petitioners thereafter filed in this court their petition to review the Commission's action. Petitioners' action constitutes the first direct court attack on constitutional grounds upon the Fairness Doctrine promulgated and executed by the Commission. It is to be noted, however, that this court has recently considered another case involving the Fairness Doctrine. See Office of Communication of United Church of Christ v. Federal Communications Commission, 123 U.S.App.D.C. 328, 359 F.2d 994 (1966).

*IV. Genesis of the Fairness Doctrine.*

Mr. Justice Frankfurter, speaking for the Supreme Court in the landmark case of National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997 (1943), succinctly but accurately outlined and documented the origin, development, and necessity for federal regulation of radio, which culminated in the Radio Act of 1927.[4]

The initial concept of a fairness doctrine certainly had its beginning in this Act, which first required that radio stations allot for campaign purposes equal time to opposing political candidates.[5] Two years later, the Federal Radio Commission extended the coverage of this statutory provision to all discussions of issues of importance to the public, Great Lake Broadcasting Company v. Federal Radio Commission, 3 F.R.C.Ann.Rep. 32 (1929), rev'd on other grounds, 59 App. D.C. 197, 37 F.2d 993 (1930), cert. dismissed, 281 U.S. 706, 50 S.Ct. 467, 74 L.Ed. 1129 (1930). Further implementation of the policy took the form of denial of licenses to radio stations using, or proposing to use, their facilities for the presentation of but one point of view. Trinity Methodist Church, South v. Federal Radio Commission, 61 App.D.C. 311, 62 F.2d 850 (1932), cert. denied, 288 U.S. 599, 53 S.Ct. 317, 77 L.Ed. 975 (1933); KFKB Broadcasting Ass'n v. Federal Radio Commission, 60 App.D.C. 79, 47

---

4. Act of Feb. 23, 1927, ch. 169, 44 Stat. 1162.

5. *Id.*, Sec. 18, at 1170.

F.2d 670 (1931); Chicago Federation of Labor v. Federal Radio Commission, 3 F.R.C.Ann.Rep. 36 (1929), aff'd 59 App.D.C. 333, 41 F.2d 422 (1930); Great Lakes Broadcasting Company v. Federal Radio Commission, *supra.*

The basic provisions of the Radio Act of 1927 [6] were incorporated into the Communications Act of 1934,[7] within which was created the Federal Communications Commission.[8]

"By this Act Congress, in order to protect the national interest involved in the new and far-reaching science of broadcasting, formulated a unified and comprehensive regulatory system for the industry. The common factors in the administration of the various statutes by which Congress had supervised the different modes of communication led to the creation, in the Act of 1934, of the Communications Commission. But the objectives of the legislation have remained substantially unaltered since 1927." Federal Communications Commission v. Pottsville Broadcasting Co., 309 U.S. 134, 137, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940). (Footnotes omitted.)

Early in its existence, the Federal Communications Commission expressed approval of the policy established by the Radio Commission when, in Young Peoples Association for the Propagation of the Gospel, 6 F.C.C. 178 (1938), it denied application for a construction permit because of the applicant's policy of refusing to permit use of its broadcast facilities for the presenting of any viewpoint differing from that of the applicant.

Thereafter, the Commission adhered to the doctrine so established and, in fact, broadened the scope of its coverage, Laurence W. Harry, 13 F.C.C. 23 (1948); WBNX Broadcasting Co., 12 F.C.C. 805 (1948); Robert Harold Scott, 3 P & F Radio Reg. 259 (1946); United Broadcasting Co., 10 F.C.C. 515 (1945); May-

flower Broadcasting Corp., 8 F.C.C. 333 (1941).

Chronologically at this point, the Commission initiated public hearings designed to reappraise and clarify the Fairness Doctrine. The hearings resulted in the 1949 Report of the Commission in the Matter of Editorializing by Broadcast Licensees, 13 F.C.C. 1246, [hereafter referred to as the *Report*]. The *Report*, in effect, codifies earlier Radio Commission rulings, pre-*Report* rulings of the Federal Communications Commission, and the Commission's accumulated experience in fairness problems, crystallized after public hearings into a basic statement of the then scope of the Fairness Doctrine. Characterizing the broadcasters as "trustees" (Id. at 1247), who operate their facilities for the public at large, the *Report* promulgated the requirement that broadcasters, while permitted to editorialize, must seek a reasonably balanced presentation of all viewpoints on public issues of controversial importance.

The *Report* considered and discussed in considerable detail the Commission's authority to administer the Act under the statutory mandate of serving only the public interest, convenience, and necessity, 47 U.S.C. §§ 307(a), 309 (1962), as well as the statutory prohibition of the Commission's power of censorship, 47 U.S.C. § 326 (1962).

Detailed quotation of these facets of the *Report's* contents is unnecessary for understanding of the chronology being here outlined. It suffices to say that in sum total the *Report* concluded that licensees of broadcast facilities, authorized to use but not to own, prescribed channels of transmission for a limited time, were required to devote a reasonable percentage of their broadcasting time to the discussion of public issues of controversial importance. Moreover, the *Report* concluded that implicit in this requirement was the obligation to design

---

6. See note 4, *supra.*

7. Act of June 19, 1934, ch. 652, 48 Stat. 1064.

8. 47 U.S.C. § 151 (1962).

and present this type of programming in such a manner that the public was afforded the opportunity to hear different and opposing positions and viewpoints on these public issues.

Noteworthy at this point is the fact that while the *Report* was based fundamentally upon the public interest standard and related statements in the Communications Act of 1934,[9] that Act substantially retained the provisions of the Radio Act of 1927 [10] relating to the allocation of equal broadcast time to opposing political candidates for public office.

A congressional inquiry into the application and operation of the Fairness Doctrine was undertaken in 1959 and resulted in the amendment of section 315.[11]

This congressional action was triggered by the Commission's rulings in interpreting the application of the then section 315 and the Fairness Doctrine to newscasts of political events by Chicago television stations, Lar Daly, 18 P & F Radio Reg. 238, aff'd on reconsideration, 18 P & F Radio Reg. 701 (1959). Congressional consideration of proposed amendments to section 315 grew out of dissimilar bills introduced in the Senate [12] and the House of Representatives.[13] The differences in the bills passed by each chamber resulted in the designation of a conference committee.[14] The resulting conference accomplished the clarification of conflicting provisions of the proposed amendment of section 315 and the enactment of that section in its present phraseology.

Subsequent to the 1959 amendment of section 315, the Commission dealt with occurring problems and questions arising under the Fairness Doctrine on an ad hoc basis, as it had forecast in the *Report*, at page 1256. This experience with respect to fairness complaints resulted, on July 25, 1963, in the Commission's mailing to all broadcast licensees a Public Notice reiterating the obligation of all broadcasters to comply with the Fairness Doctrine, 25 P & F Radio Reg. 1899 (1963). This Public Notice stressed three factual situations arising under the Fairness Doctrine, including the licensee's obligation when a personal attack was broadcast, and specifically stated:

> "(a) When a controversial program involves a personal attack upon an individual or organization, the licensee must transmit the text of the broadcast to the person or group attacked, wherever located, either prior to or at the time of the broadcast, with a specific offer of his station's facilities for an adequate response (Clayton W. Mapoles, 23 Pike & Fischer RR 586, 591; Billings Broadcasting Company, 23 Pike & Fischer, RR 951, 953)." 25 P & F Radio Reg. at 1900.

The Public Notice further advised licensees that the Commission had undertaken a study to consider what actions, either in the form of a primer or rules, would be appropriate in better defining a licensee's responsibilities under the Fairness Doctrine. The resulting study culminated on July 1, 1964, in a Public Notice identified as the Fairness Primer, 29 Fed.Reg. 10415 (1964). Although the Commission had earlier defined and elaborated on its procedures for handling fairness complaints, Letter to Oren Harris, 3 P & F Radio Reg.2d 163 (1963), the *Primer*, after digesting its rulings on the Fairness Doctrine, reiterated the policy of dealing with each complaint on an ad hoc basis but also specifically set forth that in complaints warranting Commission consideration the licensee would be afforded an opportunity to take action or to comment upon the com-

---

9. See note 7, *supra*.

10. See note 4, *supra*.

11. See note 2, *supra*.

12. S. 2424, 86th Cong., 1st Sess. (1959), U.S.Code Cong. & Admin.News 1959, p. 2564.

13. H.R. 7985, 86th Cong. 1st Sess. (1959).

14. 105 Cong.Rec. 16160, 16375, 16588 (1959).

plaint prior to disposition of the matter by the Commission, 29 Fed.Reg., at 10416.

Especially of interest in the present proceeding is the fact that the Fairness Primer contained a separate section devoted to the personal attack principle, 29 Fed.Reg. 10420–1. In substance, this section required all licensees in broadcasts attacking an individual's or a group's integrity, character, honesty, or personal qualities, in connection with controversial issues of public importance to take all appropriate steps to afford the person or persons attacked the fullest opportunity to respond.

I will now discuss, in the order in which they are enumerated in section II of this opinion, the several grounds upon which petitioners attack the Commission's action in the present case.

### Discussion of the Four Stipulated Issues.

V. Did section 315 of the Communications Act of 1934, as amended in 1959, adopt the Commission's Fairness Doctrine as set forth in the Commission's 1949 *Report*, and if so, does section 315 constitute an unconstitutional delegation of Congress' legislative function?

In essence, petitioners charge that section 315 of the Act constitutes an unlawful delegation to the Commission of congressional legislative power. They argue, quoting from Aptheker v. Secretary of State, 378 U.S. 500, 514, 84 S.Ct. 1659, 1668, 12 L.Ed.2d 992 (1964), " * * * precision must be the touchstone of legislation so affecting basic freedoms * * * " and affix this quotation to their contention that the Fairness Doctrine infringes on constitutional guarantees secured by the Bill of Rights. Selecting from section 315 and from the Public Notice of July 1, 1964, *supra*, at 10415, such phrases as "reasonable opportunity," "sufficient time for full discussion" of "controversial issues of public importance," "substantial importance to the community," "contrasting views of all reasonable elements," "of sufficient

importance to be afforded radio time," "primary controversy," "affirmative duty generally to encourage and implement the broadcast of all sides of controversial issues," "shades of opinion," petitioners argue that Congress has illegally delegated its legislative authority because of the absence of adequate standards or ascertainable criteria and that Congress cannot adopt and make a part of the statute regulations of the Commission which, in turn, fail to meet the "preciseness" required in legislation affecting basic freedoms, citing N.A.A.C.P. v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963).

The factual and legal elements involved in Aptheker v. Secretary of State, *supra*, can be immediately distinguished from those elements found in the present case. In *Aptheker*, which involved travel restrictions upon members of the Communist Party, the challenged statute governed knowing as well as unknowing conduct. It lacked " * * * criteria linking the bare fact of [Communist Party] membership to the individual's knowledge, activity or commitment." 378 U.S. at 511, 84 S.Ct. at 1666. The challenged statute created an *"irrebuttable presumption* that individuals who are members of the specified organizations will, if given passports, engage in activities inimical to the security of the United States," 378 U.S. at 511, 84 S.Ct. at 1666, and excluded "other considerations which might more closely relate the *denial of passports to the stated purpose of the legislation,"* 378 U.S. at 511, 84 S.Ct. at 1666 (emphasis supplied) (footnotes omitted). The Supreme Court, then, was compelled to find that the statutory provision *"judged by its plain import and by the substantive evil which Congress sought to control,* sweeps too widely and too indiscriminately across the liberty guaranteed in the Fifth Amendment" and was not patterned as a regulation "narrowly drawn to prevent the supposed evil." 378 U.S. at 514, 84 S.Ct. at 1668 (emphasis supplied).

In contrast, the court has in the present case a statute and Commission regula-

tions growing out of a licensing program addressed to the serving of the "public interest, convenience or necessity," 47 U.S.C. 307(a) (1962). The acceptance of this standard as a valid basis for the legislative grant of administrative power has been repeatedly upheld; Federal Communications Commission v. RCA Communications, Inc., 346 U.S. 86, 89–91, 73 S.Ct. 998, 97 L.Ed. 1470 (1953); National Broadacasting Co. v. United States, supra; Federal Communications Commission v. Pottsville Broadcasting Co., supra, 309 U.S. at 138, 60 S.Ct. 437, 84 L.Ed. 656; Federal Radio Commission v. Nelson Bros. Bond & Mortgage Co., 289 U.S. 266, 276, 285, 53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406 (1933); New York Central Securities Corp. v. United States, 287 U.S. 12, 24–25, 53 S.C. 45, 77 L.Ed. 138 (1932). Here there is no broad-reaching, all-embracive statutory provision penalizing knowing as well as unknowing conduct. The court is dealing now with a set of reasonably concise and specifically enumerated prohibitions addressed to the evils they seek to guard against. See *Report, supra,* 47 U.S.C. § 315 (1962), and the *Fairness Primer, supra.* There are in this case no "irrebuttable presumptions," since provisions are afforded for the subjects of complaints to have an opportunity to comment or take action on a complaint before administrative action of the Commission. Most obviously the statutory provision, judged by its plain import and the substantive evil which Congress sought to control, is far removed from the stain of illegality found by the Supreme Court, speaking in *Aptheker, supra,* to exist in section 6 of the Subversive Activities Control Act of 1950, 50 U.S.C. § 785 (1951).

■ Turning to the substance of petitioners' argument under this heading, I observe the standard of evaluation of an exercise of its legislative power by the Congress to be whether "Congress has stated the legislative objective, has prescribed the method of achieving that objective * * * and has laid down standards to guide the administrative

determination * * *." Yakus v. United States, 321 U.S. 414, 423, 64 S.Ct. 660, 667, 88 L.Ed. 834 (1944), and cases cited therein. There the Court also said:

"The Constitution as a continuously operative charter of government does not demand the impossible or the impracticable. It does not require that Congress find for itself every fact upon which it desires to base legislative action or that it make for itself detailed determinations which it has declared to be prerequisite to the application of the legislative policy to particular facts and circumstances impossible for Congress itelf properly to investigate. The essentials of the legislative function are the determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct * * *. These essentials are preserved when Congress has specified the basic conditions of fact upon whose existence or occurrence, ascertained from relevant data by a designated administrative agency, it directs that its statutory command shall be effective. It is no objection that the determination of facts and the inferences to be drawn from them in the light of the statutory standards and declaration of policy call for the exercise of judgment, and for the formulation of subsidiary administrative policy within the prescribed statutory framework. * * *

"Nor does the doctrine of separation of powers deny to Congress power to direct that an administrative officer properly designated for that purpose have ample latitude within which he is to ascertain the conditions which Congress has made prerequisite to the operation of its legislative command." Yakus v. United States, at 424–425, 64 S.Ct. at 667.

There appears to be no doubt but that the Supreme Court's references in *Yakus* to "an administrative officer" would apply equally and without qualification to a duly constituted administrative agency.

In reviewing the provisions of Title 47 U.S.C., I find clearly defined and explicitly enumerated statements of the legislative objectives, the enumeration of the method of achieving those objectives *(id est,* the creation of the Federal Communications Commission and the assignment to it of specific and enumerated duties, responsibilities, and obligations), and the establishment of standards to guide the administrative determination. See section 309, "Application for license—Considerations in granting application;" section 310, "Alien ownership as barring station license; assignment and tranfer of construction permit or station license;" section 311, "Requirements as to certain applications in the broadcasting service—Notices of filing and hearing; form and contents;" section 312, "Administrative sanctions—Revocation of station license or construction permit;" and other similar sections.

Within the framework of 47 U.S.C. §§ 151–319 (1962), I find a full and complete determination of the legislative policy and its formulation and promulgation as a defined and binding rule of conduct. Relating these specifically to the provisions of section 315, I find in this portion of the statute a permissible delegation to the Commission of the "determination of facts and the inferences to be drawn from them in the light of the statutory standards and declaration of policy" properly and legally empowering "the exercise of judgment." This allowable assignment of authority and responsibility, Fairness Primer, 29 Fed. Reg. 10415, constitutes a valid and proper formation of subsidiary administrative policy within the prescribed statutory framework.

Continuing to petitioners' charge that the Fairness Doctrine lacks the preciseness required in statutes "affecting basic freedoms." N.A.A.C.P. v. Button, *supra,* the Supreme Court, speaking in National Broadcasting Co. v. United States, *supra,* has effectively answered this question when it stated:

"The touchstone provided by Congress was the 'public interest, convenience,

or necessity,' a criterion which 'is as concrete as the complicated factors for judgment in such a field of delegated authority permit.' Federal Communications Comm'n v. Pottsville Broadcasting Co., 309 U.S. 134, 138 [60 S.Ct. 437, 84 L.Ed. 656]. 'This criterion is not to be interpreted as setting up a standard so indefinite as to confer an unlimited power. Compare New York Central Securities Co. v. United States, 287 U.S. 12, 24 [53 S.Ct. 45, 77 L.Ed. 138]. The requirement is to be interpreted by its context, by the nature of radio transmission and reception, by the scope, character, and quality of services * * *.' Federal Radio Comm'n v. Nelson Bros. [Bond & Mortgage] Co., 289 U.S. 266, 285 [53 S.Ct. 627, 77 L.Ed. 1166, 89 A.L.R. 406]." 319 U.S. at 216, 63 S.Ct. at 1009.

■■ Since the "public interest" is by statute and court decision a valid standard for the Commission's guidance, I find the necessary precision required by *Aptheker* in the situation arising in the present case. I conclude that the adoption by Congress of the Commission's Fairness Doctrine in its 1959 amendment of section 315 of the Communications Act of 1934 does not constitute an unconstitutional delegation of Congress' legislative function.

VI. Is the Fairness Doctrine unconstitutionally vague, indefinite, uncertain and/or lacking the precision which legislation affecting the basic freedoms guaranteed by the Bill of Rights requires?

Obviously, this question overlaps the discussion of the prior question, and petitioners' brief, as well as respondents' brief, duplicate in some measure the discussion of the present subheading and that of subheading V above. Again, from the starting point of the *Aptheker* case, *supra,* the petitioners, finding in their present situation a possible sanction, *id est,* the forfeiture of a valuable right to operate a radio station, seek solace from the fact that *Aptheker* in-

volved penal sanctions. Claiming violation of their constitutional rights under the first and fifth amendments to the Constitution, petitioners argue that in applying the Fairness Doctrine to them, the Commission, having failed first to ascertain the truth of Cook's charges against them but requiring them, nevertheless, to afford Cook free time to reply to the Hargis broadcast, is abrogating their right to free speech in the dissemination of truth, if the Hargis charges against Cook are, in fact, true. Continuing their argument to the allegation of a due process infringement, petitioners contend that the vagueness in the Fairness Doctrine, as it is herein invoked against them, violates the first essential of due process of law in violation of the fifth amendment. Connally v. General Construction Co., 269 U.S. 385, 46 S.Ct. 126, 70 L.Ed. 322 (1926).

As noted earlier, this case presents the first direct challenge to the constitutionality of the Fairness Doctrine, although we took passing notice of it recently by observing " * * * that adherence to the Fairness Doctrine is a *sine qua non* of every licensee." Office of Communication of United Church of Christ v. Federal Communications Commission, *supra*, 123 U.S.App.D.C. at 343, 359 F.2d at 1009.

■ The first amendment extends, of course, to broadcasting, as well as to other media of expression. National Broadcasting Co. v. United States, *supra*, but "(u)nlike other modes of expression, radio inherently is not available to all. That is its unique characteristic, and that is why, unlike other modes of expression, it is subject to governmental regulation." 319 U.S. at 226, 63 S.Ct. at 1014. This court has had not infrequent occasions to consider first amendment challenges to various actions of the Commission. Thus, in Idaho Microwave, Inc. v. Federal Communications Commission, 122 U.S.App.D.C. 253, 352 F.2d 729 (1965), we rejected the contention that the imposition of a nonduplication condition upon a licensee was violative of the first amendment. Earlier, speaking in Carter Mountain Transmission Corporation v. Federal Communications Commission, 116 U.S.App.D.C. 93, 321 F.2d 359 (1963), cert. denied, 375 U.S. 951, 84 S.Ct. 442, 11 L.Ed.2d 312 (1963), we rejected appellant's contention that the first amendment guaranteed the use of all means of public communication free of restraint or denial imposed by the Commission's ruling. Similarly, in Henry v. Federal Communications Commission, 112 U.S.App.D.C. 257, 302 F.2d 191 (1962), cert. denied, 371 U.S. 821, 83 S.Ct. 37, 9 L.Ed.2d 60 (1962), we denied a contention that the constitutional guarantee of free speech was abridged by a Commission ruling denying a license application upon the ground that the program proposals of the applicant were not designed to serve the needs of the proposed area. This court has made similar rulings in Johnston Broadcasting Company v. Federal Communications Commission, 85 U.S.App.D.C. 40, 175 F.2d 351 (1949); Bay State Beacon, Inc. v. Federal Communications Commission, 84 U.S.App.D.C. 216, 171 F.2d 826 (1948); and in Simmons v. Federal Communications Commission, 83 U.S.App. D.C. 262, 169 F.2d 670 (1948), cert. denied, 335 U.S. 846, 69 S.Ct. 67, 93 L. Ed. 396 (1948).

It appears to be well documented, then, that because of its unique characteristics the courts have consistently held that regulatory action by the Commission, acting within the framework and provisions of the statutes embraced in Title 47 U.S.C., does not per se violate the first amendment.

Looking specifically to the actual operation of the Fairness Doctrine as applied to these petitioners in this present case, I observe, first of all, that petitioners are not prohibited from broadcasting any program which petitioners think suitable. Moreover, petitioners are not furnished with a mandatory program format, nor does the Doctrine define which, if any, controversial issues are to be the subject of broadcasting. The latitude of petitioners' operation of their station insofar as programming is concerned is

limited only by petitioners' discretion and good faith judgment. See Commission's Policy on Programming, 20 P & F Radio Reg. 1901(1960) and the *Report, supra.*

The Fairness Doctrine impact arises, then, when in petitioners' exercise of their own judgment, they broadcast a program dealing with controversial issues of public importance. After having independently selected the controversial issue and having selected the spokesman for the presentation of the issue in accord with their unrestricted programming, the Doctrine, rather than limiting the petitioners' right of free speech, recognizes and enforces the free speech right of the victim of any personal attack made during the broadcast. Such an attack, the Doctrine directs, necessitates the petitioners' affording the maligned victim an opportunity to respond. Does such an obligation arising under these conditions deprive petitioners of any right guaranteed by the first amendment? I think not.

The American people own the broadcast frequencies. Speaking through their elected representatives in Congress, they have established a program of licensing the temporary use of allocated frequencies to broadcasters who meet the standards established by Congress in Title 47 U.S.C. as administered thereunder by the Commission. The broadcasters, then, acquire no ownership of assigned channels but are authorized to use them for the service of the public interest, convenience, or necessity. In keeping with the public interest, I agree with the Commission that:

"It would be inconsistent * * * to assert that, while it is the purpose of the act to maintain the control of the United States over radio channels, but free from any regulation or condition which interferes with the right of free speech, nevertheless persons who are granted limited rights to be licensees of radio stations, upon a finding under Sections. 307(a) and 309 of the act that the public interest, convenience, or necessity would be served thereby, *may themselves make*

*radio unavailable as a medium of free speech." Report, supra,* at 1248. (Emphasis supplied.)

Although addressing itself to a Sherman Act situation involving newspaper services, the Supreme Court's admonition in Associated Press v. United States, 326 U.S. 1, 20, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013 (1945), appears to me equally applicable with minor changes in syntax to the present case:

"It would be strange indeed however if the grave concern for freedom of the press which prompted adoption of the First Amendment should be read as a command that the government was without power to protect that freedom. * * * That Amendment rests on the assumption that the widest possible dissemination of information from diverse and antagonistic sources is essential to the welfare of the public, that a free press is a condition of a free society."

■ My conclusion in this regard is uninfluenced by petitioners' contention that the Commission in some manner has an obligation to first ascertain whether the complaint made to the Commission by Cook was "in fact true or false." There is, of course, no statutory requirement for such a finding. Additionally, it is my view that any attempt by the Commission to make factual determinations of truth or falsity in controversial issues of public interest would constitute an illegal exercise of a nonexistent authority. The basic concept of free speech is unfettered by any requirement that it be exercised only by those with a "right" viewpoint:

"Accordingly a function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of

speech, though not absolute, Chaplinsky v. New Hampshire, *supra*, pp. 571–572 [315 U.S. 568, 62 S.Ct. 766, at page 769, 86 L.Ed. 1031], is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." Terminiello v. City of Chicago, 337 U.S. 1, 4, 69 S.Ct. 894, 896, 93 L.Ed. 1131 (1948).

I reject the suggestion that the Commission has either the obligation, or even the authority, to make determinations of the right or wrong in factual disputes involving controversial issues of public interest.

■ The thrust of petitioners' challenge to the Commission action as an abridgement of their fifth amendment rights is rather difficult to specifically articulate. Briefing and argument combine and interweave the vagueness argument indistinguishably about both the first and fifth amendments. Specifically, we are told that arguments advanced by petitioners in support of the questions discussed in part V of this opinion also support the allegation that the "vice of vagueness violates the due process clause of the Fifth Amendment * * *." (Petitioners' brief at 17.) As I have set forth under part V of this opinion, I do not believe that either the Fairness Doctrine or the statutory provisions from which it flows are lacking in any required standards of preciseness. My view is that the statutes and the Doctrine are sufficiently explicit to inform those who are subject to them what conduct on their part will render them liable to penalties. Neither the statute nor the doctrine either forbid or require the doing of an act in terms so vague that men of common intelligence must necessarily guess at their meaning and differ as to their application. See Connally v. General Construction Co., 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1925). Moreover, broadcasters are protected against the abuse of power by the Commission by the procedural safeguards of Title 47 U.S.C., by the provisions of the Administrative Procedure Act,[15] and finally, by the right of appeal to the courts for relief from any final action claimed to be arbitrary or capricious. The petitioners are not deprived of due process by the operation of the Fairness Doctrine.

VII. Does section 315 violate the ninth and tenth amendments to the Constitution?

■ In four sentences in their brief (p. 20) petitioners assert that the Fairness Doctrine infringes upon the rights guaranteed by the ninth and tenth amendments. Relying upon United Public Workers v. Mitchell, 330 U.S. 75, 94, 67 S.Ct. 556, 91 L.Ed. 754 (1947), petitioners point out that there is therein an explicit protection of the right of the people to engage in political activity. The argument then disclaims this case as representing any authority for "so restricting the rights of the people generally or the owners or users of media of communications such as radio or the press." The conclusion is drawn that the "prior restraint occasioned by the imposition of the 'Fairness Doctrine' infringes on the guarantee of the political rights retained by the people including petitioners herein and all paying users of Petitioners' radio facilities," and "the First Amendment's prohibitions clearly fall within the Tenth Amendment" as "powers not delegated to the United States by the Constitution are retained by the people." See petitioners' brief at page 20.

Again I encounter some difficulty in applying these general allegations to the facts in this case. Accepting United Public Workers v. Mitchell, *supra,* with some obvious limitations, for the principle announced by petitioners, I find little in the actual holdings of the Court as to the rights of federal employees under the Hatch Act which relates to

15. 5 U.S.C. §§ 1001–1011 (1950).

the factual situation here before us. I do not find in the operation of the Fairness Doctrine any restriction upon the rights of the people to engage in political activities, as I pointed out in some detail in part VI above. Broadcasters alone determine the programs they will carry, the format to be followed, and the personnel to be utilized in those broadcasts. In political matters, the licensee alone has "the right and nondelegable duty of * * * acting reasonably, to determine whether a program * * * is in the public interest." Regents of New Mexico v. Albuquerque Broadcasting Co., 158 F.2d 900, 906 (10th Cir. 1947). While generally a licensee is responsible for all matter carried on his station, Congress has gone so far as to relieve him of this responsibility with respect to broadcasts by candidates for political office by stripping him of his power to censor. See section 315 and Farmers Educational and Cooperative Union v. WDAY, 360 U.S. 525, 79 S.Ct 1302, 3 L.Ed. 1407 (1959).

The Commission, in supporting its action in this case, construes petitioners' challenge under this point as being addressed to its requirements imposed on the licensees after the personal attack, with special reference to the mandated granting of cost-free time to the victim to respond as his financial circumstances require. If this is the thrust of petitioners' charge, I readily agree that the compulsory granting of free time may, and probably does, impose a burden on the licensees. This burden, however, is not an unreasonable one. The broadcasters' licenses are issued upon a finding by the Commission that the public interest will be served thereby, and thus, the licensees accept the responsibility of discharging what is in actuality their public trust. There remains to the licensee the right, in the exercise of good faith discretion, of utilizing a paying spokesman to respond to a personal attack if one is available. But:

"* * * [W]here the licensee has chosen to broadcast a sponsored program which for the first time presents one side of a controversial issue, has not presented (and does not plan to present) contrasting viewpoints in other programming, and has been unable to obtain paid sponsorship for the appropriate presentation of the contrasting viewpoint or viewpoints, he cannot reject a presentation otherwise suitable to the licensee—and *thus leave the public uninformed*—on the ground that he cannot obtain paid sponsorship for that presentation." (Emphasis in original.) Cullman Broadcasting Co., Inc., 25 P & F Radio Reg. 895, 896 (1963).

I conclude that there is no abridgement of petitioners' rights in the application of the Fairness Doctrine to their activities in this case. In so doing, I have considered the entire record in an effort to perceive and understand the petitioners' ninth amendment claim, despite the vague and general nature of their brief upon this point. I observe further in this regard the paucity of cases defining, enumerating, or interpreting ninth amendment rights. Mr. Justice Goldberg, speaking in a concurring opinion in Griswold v. State of Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1964), cites but three Supreme Court cases treating of the ninth amendment during the entire period of the Court's existence supplemented by two "see also" citations. 381 U.S. at 490–491, 85 S.Ct. 1678.

Mr. Justice Stewart, while dissenting in *Griswold, supra,* pointed out that:

"The Ninth Amendment, like its companion the Tenth, which this Court held 'states but a truism that all is retained which has not been surrendered,' United States v. Darby, 312 U.S. 100, 124 [61 S.Ct. 451, 462, 85 L.Ed. 609, 132 A.L.R. 1430] was framed by James Madison and adopted by the States simply to make clear that the adoption of the Bill of Rights did not alter the plan that the *Federal* Government was to be a government of express and limited powers, and that all rights and powers not delegated to it were retained by the people and the

individual States." 381 U.S. at 529–530, 85 S.Ct. at 1706.

I apply to the petitioners' ninth amendment [16] argument Mr. Justice Stewart's statement in *Griswold, supra,* at 529, 85 S.Ct. at 1706, "[b]ut to say that the Ninth Amendment has anything to do with this case is to turn somersaults with history."

█ The thrust of the tenth amendment argument attempts to place section 315 within the ambit of powers not delegated to the United States by the Constitution. The threshold weakness of this contention is that the Supreme Court has affirmatively held that the broadcasting system established by Title 47 U.S.C. is a proper exercise of the constitutional power of Congress over commerce. National Broadcasting Co. v. United States, *supra,* and in enacting Title 47 U.S.C., Congress must be deemed to have exercised its power within constitutional limitations. Sablowsky v. United States, 101 F.2d 183 (3rd Cir. 1938). I have discussed in part V of this opinion the right of Congress, under established precedents, to delegate the administration of statutory provisions to agency determination. It follows, then, that Congress having acted herein under specifically identified constitutional power, approved by the Supreme Court, properly delegated execution of its statutory mandate to the Commission. Therefore, there exists in this case no transgression of any power reserved to the states or the people. "If granted power is found, necessarily the objection of invasion of those rights, reserved by the Ninth and Tenth Amendments, must fail." United Public Workers v. Mitchell, *supra,* 330 U.S. at 96, 67 S.Ct. at 567.

VIII. Does the Fairness Doctrine impair free speech in violation of the first amendment by imposing a prior restraint upon the expression of views, argu-

ments, and opinions by petitioners, as well as by all other owners of radio stations, and upon those who pay for the use of such facilities?

Beginning with citations and irrefutable quotations relating to the purposes, the meaning, and the breadth and scope of the Bill of Rights, and especially of the first amendment, from New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686, 95 A.L.R.2d 1412 (1964); West Va. State Board of Education v. Barnett, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628, 147 A.L.R. 674 (1943); United States v. Paramount Pictures, Inc., 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948); Thornhill v. State of Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); Grosjean v. American Press, 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1936); Near v. State of Minnesota ex rel. Olson, 283 U.S. 697, 51 S.Ct. 625, 75 L.Ed. 1357 (1931); and McIntire v. William Penn Broadcasting Co. of Philadelphia, 151 F.2d 597 (3rd Cir. 1945), cert. denied, 327 U.S. 779, 66 S.Ct. 530, 90 L.Ed. 1007 (1946), the petitioners contend that the Fairness Doctrine, measured against the principles of those cases, imposes a direct and previous restraint upon the right of free speech guaranteed by the first amendment. This results, say petitioners, from the Doctrine's restraining a licensee from speaking out editorially on issues of public importance except on condition that he seek out and grant free time to another to express opposi-torial views. Further restraint arises, they say, because an owner of a station "may not permit his facilities to be used by a paying citizen to speak out in opposition to governmental action or policy unless such owner makes available free time commensurate with the paid time to voice the contrary view." It follows, say petitioners, that the Fairness Doctrine creates "previous restraint [and the] fear of subsequent punish-

---

16. For additional citations to discussions of the origin of, reasons for, and applicability of the ninth amendment, see

*Griswold,* 381 U.S. 489, 490, 491, 85 S.Ct. 1678, and footnotes thereon.

ment" through danger or threat of the forfeiture of the licensee's license. Beyond this the petitioners further argue they are forced by the Doctrine to surrender "as a pre-condition to the obtaining of a radio station license," their right of freedom of speech and are, finally, compelled to assume the "unlawful obligation" of becoming the "first censor" of all public interest broadcasts at the risk of ultimate loss of their broadcasting license at renewal time if their censorship is not to the liking of the Commission.

I begin, then, with an examination of the reasons advanced by the respondents for the formation and operation of the Doctrine:

> "And so, as cases arise, the delicate and difficult task falls upon the courts to weigh the circumstances and to appraise the substantiality of the reasons advanced in support of the regulation of the free enjoyment of the [constitutional] rights." Schneider v. State of New Jersey, 308 U.S. 147, 161, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939).

First, then, I set forth in the several following paragraphs the respondents' reasons, advanced in brief and oral argument, for the regulations constituting the Fairness Doctrine.

Radio broadcasters, state the respondents, by utilizing the limited number of publicly-owned broadcast facilities and operating on a license valid for a limited period, carry on their programs as trustees for the public at large because of the Commission's determination that each licensee's operation will promote the public interest. The broadcasters, as public trustees, have an obligation in a democratic society to inform the beneficiaries of the trusteeship, *id est,* the public, of the different attitudes and viewpoints which are held by the various groups which make up the community. The first amendment establishes an in-

formed electorate as the foundation stone of a democracy.

> "In presenting programs dealing with controversial issues of public importance, the fairness doctrine imposes upon licensees the affirmative obligation to afford reasonable opportunity for the expression of conflicting viewpoints. As such, it is reasonably related to the statutory scheme which provides that licenses are issued for limited times to persons who act not in their own private interest, but as 'trustees' for the public's interest in 'the larger and more effective use of radio,' 47 U.S.C. 303(g)." [17] Respondent's brief at 21.

The "public interest," continue the respondents, having been consistently sustained by the courts as a valid standard to guide the Commission in the exercise of its prescribed duties, have been made more precise by the incorporating into the Communications Act of 1934 of the fairness principle. A broadcast station, not being a common carrier, and having both the duty and the right of determining whether a controversial program is in the public interest, must, after having exercised that determination by broadcasting a particular program, in the public interest afford equal opportunity for the broadcast of the other side of that controversial issue. This burden exists equally well when the initial broadcast consists of a personal attack upon a person or organization. The crucial consideration is the public interest in hearing both sides. The licensees' obligation to present both sides does not arise from the factual truth or falsity of the broadcast, because in the application of the Doctrine the ultimate determination of the merits of the issue will be made by the general public for whose information, presumably, the initial broadcast was originally made.

> "[The freedom of speech guaranteed by the First Amendment] presupposes

---

17. 47 U.S.C. § 303(g) (1962) reads as follows: "Study new uses for radio, provide for experimental uses of frequencies, and generally encourage the larger and more effective use of radio in the public interest."

that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." United States v. Association Press, 52 F.Supp. 362, 372 (L. Hand, J.) (S.D.N.Y.1945), aff'd, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945).

 Against this backdrop and the entire record, I do not find in this case the existence of any "prior or previous restraint." Concise or even broad definitions of the factual situations or practices which constitute a prior restraint are non-existent within the wide scope of the Court's review of first and fourteenth amendment cases. Certainly, however, any type of Government censorship imposed prior to permitted publication is an abrogation of first amendment guarantees. Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 72 S.Ct. 777, 96 L.Ed. 1098; Schneider v. State of New Jersey, *supra;* Grosjean v. American Press Co., *supra.* Similarly, a licensing program operating in fact as a censorship program constitutes a first amendment violation. Burstyn, Inc. v. Wilson, *supra.* Accepting readily the obvious fact that other situations could constitute a prior restraint, I confine my discussion to the facts in the present case. The petitioners are in no manner exposed to or subject to any prior censorship of their broadcasts. There latitude in the selection of program material, program substance, program format, and identity of program personnel is bounded only by their own determination of the public interest appeal of their end product. They are not required to submit any broadcast material to the Commission, or any other Government agency, prior to broadcast. It is obvious that there is involved in this case no censorship which constitutes prior or previous restraint. It seems almost superfluous for me to have to point out that section 326 specifically prohibits any censorship action on the part of the Commission.

Turning, then, to the licensing scheme incorporated in Title 47 U.S.C., I observe readily that no provision whatsoever reauires the license applicant to waive, forego, or sacrifice the liberty to discuss, when licensed, publicly all matters of public concern. Consideration of public interest, convenience, and necessity are alone the prescribed existing and operational standards for eligibility for issuance of a broadcast license. Although petitioners allege that a fear of punishment may constitute a de facto restraint upon the exercise of their free speech guarantees through a denial of their ultimate renewal application, I point out—as I have done before in this opinion—that the remedial provisions of Title 47 U.S.C., the Administrative Procedure Act, and the accessibility of the courts guarantee petitioners full redress from any illegal, arbitrary, or capricious conduct on the part of the Commission. Petitioners have full access to the ground rules governing the Fairness Doctrine, since they have been printed in the Federal Register, 29 Fed. Reg. 10416, and furnished to all broadcast licensees. Broadcasters have full opportunity to answer any complaint against their station, *Letter to Oren Harris, supra,* and may request a ruling from the Commission if they are in doubt whether a particular set of facts is within the Doctrine. Cullman Broadcasting Co., *supra.* Finally, I observe that the Commission has recorded its position against the invocation of sanctions against any broadcaster for an honest mistake in judgment. *Report, supra,* at 1246 and Capitol Broadcasting Co., 2 P & F Radio Reg.2d 1104 (1964).

 Weaving together the several threads of discussion presented in this section of this opinion, I conclude that there is no abrogation of the petitioners' free speech right. On the contrary, I find that the conduct of the petitioners absent the remedial procedures afforded the complainant Cook would, in fact, constitute a serious abridgement of his free speech rights. I find in the Fairness Doctrine a vehicle completely legal in

its origin which implements by the use of modern technology the "free and general discussion of public matters [which] seems absolutely essential to prepare the people for an intelligent exercise of their rights as citizens," Grosjean v. American Press, *supra*, 297 U.S. at 249, 56 S.Ct. at 449, 80 L.Ed. 660. Having found no violation de jure or de facto of petitioners' rights, I am absolved from further consideration, at least in this case, of the reasons advanced by the Commission for the existence of the doctrine (referring back, of course, to the doctrine of *Schneider, supra*).

### Conclusions

1. 47 U.S.C. § 315 (1962) adopted the Commission's Fairness Doctrine, as set forth in the Commission's 1949 *Report, supra,* and in so doing, the Congress did not commit an unconstitutional delegation of its legislative function.

2. The Fairness Doctrine is not unconstitutionally vague, indefinite, or uncertain, nor does it lack the precision required in legislation affecting basic freedoms guaranteed by the Bill of Rights.

3. Neither 47 U.S.C. § 315 (1962) nor the Fairness Doctrine is violative of the ninth or tenth amendments to the Constitution.

4. Under the facts in this case, the requirement under the Fairness Doctrine that a broadcaster may not insist upon financial payment by a party responding to a personal attack does not violate the first and fifth amendments to the Constitution nor is the Doctrine violative of either the ninth and tenth amendments.

The Commission action under review is

Affirmed.

FAHY, Circuit Judge:

I concur in the result reached by Judge Tamm and in general with his reasoning, without committing myself to all details of the opinion. For example, I have doubts that the fairness doctrine "recognizes and enforces the free speech right of the victim of any personal attack made during the broadcast." I agree with the Commission without finding it necessary to accede to this position.

Moreover, I agree with the Commission that a reply to a personal attack is not conditioned upon the ability of the licensee to obtain paid sponsorship for the reply. As to the procurement of sponsorship I need go no further than the case of a personal attack.

WILBUR K. MILLER, Senior Circuit Judge, did not participate in the consideration and decision of this case on the merits, set forth in the foregoing opinion.