**DEMOCRATIC NATIONAL COMMITTEE, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**American Broadcasting Companies, Inc., et al., Intervenors.**

**REPUBLICAN NATIONAL COMMITTEE, Petitioner,**

v.

**FEDERAL COMMUNICATIONS COMMISSION and United States of America, Respondents,**

**Democratic National Committee et al., Intervenors.**

**Nos. 71–1637, 71–1723.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 4, 1971.

Decided Feb. 2, 1972.

---

**28.** See note 11, *supra*, 351 U.S. at 205, 76 S.Ct. 763.

**29.** 135 U.S.App.D.C. 330, 331, 418 F.2d 1166, 1167–1168 (1969) (footnotes omitted).

Mr. Joseph A. Califano, Jr., Washington, D. C., with whom Mr. Charles H. Wilson, Jr., Washington, D. C., was on the brief, for petitioner in No. 71–1637 and intervenor Democratic National Committee in No. 71–1723.

Mr. James J. Freeman, Washington, D. C., with whom Mr. W. Theodore Pierson, Washington, D. C., was on the brief, for petitioner in No. 71–1723 and intervenor Republican National Committee in No. 71–1637.

Mr. Joseph A. Marino, Counsel, Federal Communications Commission, with whom Messrs. Richard E. Wiley, General Counsel at the time the brief was filed, and Charles A. Zielinski, Counsel, Federal Communications Commission, were on the brief, for respondents.

Mr. Vernon L. Wilkinson, Washington, D. C., with whom Messrs. James A. McKenna, Jr., Carl R. Ramey and Edward P. Taptich, Washington, D. C., were on the brief, for intervenor American Broadcasting Companies, Inc.

Mr. Timothy B. Dyk, Washington, D. C., with whom Mr. J. Roger Wollenberg, Washington, D. C., was on the brief, for intervenor Columbia Broadcasting System, Inc.

Messrs. Lawrence J. McKay, New York City, Donald J. Mulvihill and Howard Monderer, Washington, D. C., were on the brief for intervenor National Broadcasting Co., Inc.

Mr. Earle K. Moore, New York City, was on the brief for intervenor Office of Communication of the United Church of Christ in No. 71–1723.

Mr. Lee A. Rau, Atty., Department of Justice, entered an appearance for respondent United States of America in No. 71–1637.

Mr. Howard E. Shapiro, Atty., Department of Justice, entered an appearance for respondent United States of America in No. 71–1723.

Before TAMM and MacKINNON, Circuit Judges, and A. SHERMAN CHRISTENSEN,* U. S. District Judge for the District of Utah.

TAMM, Circuit Judge:

In these consolidated appeals we are once again asked to review a decision of the Federal Communications Commission (hereinafter either "FCC" or "the Commission") which was issued under the Commission's fairness doctrine. The two petitioners are the Democratic National Committee (hereinafter "DNC") and the Republican National Committee (hereinafter "RNC"). The three major networks, American Broadcasting Companies (ABC), Columbia Broadcasting System, Inc. (CBS), and the National Broadcasting Company

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d) (1970).

(NBC), have all intervened in these actions and have filed briefs with the court, as has the Office of Communication of the United Church of Christ. While the issues in both actions revolve around the fairness doctrine, they do not raise precisely the same questions of law or involve the same facts. Therefore, it will be necessary for us to examine the facts and contentions of each of the petitioners separately.

I. The Facts

A. *Democratic National Committee v. Federal Communications Commission*, No. 71–1637

DNC placed three questions before us in its pleadings. They are:

(1) Did the FCC construe the fairness doctrine so as to deny DNC an opportunity to respond to three presidential network appearances thereby constituting an arbitrary act contrary to the "public interest" standard of the Communications Act of 1934?

(2) Did the FCC's application of the fairness doctrine conflict with the paramount first amendment right of the public to be informed on the controversial issues of the day which affect the conduct of our government?

(3) Were the FCC's procedures in this case adequate to safeguard the first amendment interests relating to the fairness doctrine which were involved in this litigation?

DNC now requests us to review the Memorandum Opinion and Order of the Commission, 22 P. & F. Radio Reg.2d 727 (1971), which denied a request by DNC to compel the three major networks to provide time for DNC to respond to three separate appearances made by the President of the United States on radio and television.

The first of the appearances to which DNC seeks the right to respond was a March 15, 1971 telecast of the "Today" show broadcast over the NBC Television Network. During the two hour show there was a 48 minute interview of the President by Barbara Walters, one of the show's regular staff. This interview centered on the President's family life, the effect of his public career on his wife and family, and the role of his wife in his decisions as a public official. The President also gave his opinion as to "many of the important issues of the day." (J.A. 1.) NBC refused a request by Lawrence F. O'Brien, Chairman of the DNC, for exposure on "Today" similar to that afforded the President.

The second broadcast to which DNC sought to reply was entitled "A Conversation With the President" appearing March 22, 1971 on ABC. The program was a one-hour interview by Howard K. Smith. This program was broadcast simultaneously over both ABC radio and television. A major portion of this interview related to an explanation of the President's program and policies in Vietnam. He espoused the virtues of his Vietnamization program and of his policy of not announcing a date certain for total withdrawal of all American forces in Southeast Asia. The President also spoke about his veto of the election reform bill during the last session of Congress which had the wide-spread support of the Democratic Party. In addition he explained the rationale for his proposed revenue-sharing proposals to the Congress. ABC rejected DNC's request for time to respond to the interview.

The last of the programs here in question involved a Presidential address to the nation on April 7, 1971, on all three major networks, on both radio and television. The broadcast involved the Administration's programs and policies in Southeast Asia. DNC contends that

[t]he address was a forceful defense of the President's Vietnam war policies. It was also highly partisan in tone and content. The President unambiguously placed the blame for that tragic conflict on previous Democratic administrations and strongly suggested that his predecessors had no program to bring that war to an end. (A. 80) At the same time, he claimed

unqualified success for his policies, including his Vietnamization program and the military invasions of Cambodia and Laos. (A. 80–82.)

(DNC Br. at 5.) Once again, the President explained his opposition to establishing a fixed date for withdrawal of all of our troops from Vietnam. The views expressed by the President in this area were in direct conflict with those of the Senate and House Democratic Caucuses and of the DNC Policy Council. DNC sent telegrams to each of the networks requesting an opportunity to respond. This request was denied by NBC and CBS. ABC agreed to grant the Democratic Party one-half hour of prime-time to permit a spokesman to speak about the American policy in Vietnam and explain the differences between the Administration's policy and that of the Democratic Party. On April 22, 1971, ABC broadcast "Indochina: Another View" on both ABC radio and television.

Alleging violations of the fairness doctrine, DNC filed four complaints with the FCC requesting that the networks be directed to provide time to DNC to respond to the above described Presidential appearances. Specifically they requested the Commission to order responses to (1) the March 15 interview on "Today" and the April 7 Indochina address on NBC; (2) the March 22 Howard K. Smith interview on ABC; and (3) the April 7 CBS presentation of the Indochina address.

The gravamen of the DNC complaint was

> that the three television appearances at issue were part of a deliberate presidential television blitz designed to provide increased exposure for President Nixon's positions on controversial issues and to improve his image with the electorate at a time when the 1972 presidential campaign was underway. Unless response time were afforded to the Democratic Party, the complaints stated, the President would have a virtual monopoly over access to the most powerful and influential of all communications media.

(DNC Br. at 7.)

Two of the complaints, one regarding the Howard K. Smith interview and the second being the Indochina address, were based on traditional fairness doctrine principles. DNC contends that those appearances were of a partisan nature requiring rebuttal by the opposition party. As to the "Today" show broadcast, it was DNC's position that the sole purpose of the show was to improve the President's image with the voting public. This, they assert, was a purely political appearance which gave rise to an "equal opportunity" situation under § 315 of the Communications Act of 1934.

In their answers to DNC's complaint, the three networks alleged that the fairness doctrine only required that there be a reasonable opportunity for discussion of conflicting views with regard to issues of public importance. It was the networks' contention that they had each achieved the required balanced broadcasting of each of the issues discussed by President Nixon in the three appearances in question and that refusal of DNC's request for time to respond was therefore justified. To support these contentions both ABC and CBS submitted detailed data on programs on which parties opposed to the Administration's war policy had appeared. NBC did not submit any such data but did allege achievement of the required programming balance. DNC then requested the FCC to hold an evidentiary hearing in order to test the presentations of the networks' by way of the adversary process.

DNC wrote to FCC Chairman Burch more than three months after filing its complaint to protest the Commission's delay in ruling on the DNC complaints. Two weeks later, still having no indication of action by the Commission, this suit was filed. However, on August 20, 1971, the Commission issued its Memorandum Opinion and Order, 22 P. & F. Radio Reg.2d 727 (1971), denying DNC

the relief sought. We shall consider the Commission's ruling *infra*.

B. *Republican National Committee v. Federal Communications Commission*, No. 71–1723

RNC also seeks review of the Commission's Memorandum Opinion and Order, FCC 71–882, of August 20, 1971, 22 P. & F. Radio Reg.2d 727 (1971), which denied RNC's claim that ABC had violated the fairness doctrine. In seeking this review RNC raises two distinct questions which were not raised by DNC. Initially, RNC claims that it was error for ABC to fail to consider its non-news programs in determining whether fairness had been achieved in its coverage of the war in Indochina. Secondly, RNC asserts that it was error for the Commission to fail to meaningfully articulate disposition of RNC's complaint that ABC failed to consider a meaningful viewpoint in its coverage of the Vietnam war, *i. e.*, the position of the Republican Party.

RNC requested that ABC grant it time to respond to Chairman O'Brien's broadcast which was in response to the President's radio and television broadcast of April 7, 1971. In its response to O'Brien's request ABC maintained that its "overall coverage of the Indochina issue ha[d] been fair and balanced, complying fully with the requirements of the FCC Fairness Doctrine," (J.A. 86) nevertheless, ABC granted DNC a half-hour of prime-time in order to present the views of the Democratic Party after determining that "in view of the importance to the nation of the Indochina issue, additional coverage at this time would serve the public interest." *Id.*

RNC was particularly concerned that ABC's grant of time to DNC would serve only to polarize the war issue along partisan lines. They took this position based on ABC's statement that prior coverage had been fair and balanced. It was RNC's feeling that once these partisan presentations were begun that RNC should be given an opportunity to present the views of the Republican Party *qua* political party. In responding to RNC, ABC made it clear that they were not of the belief that DNC was automatically entitled to, or granted, a right to respond to the President's appearance. ABC asserted that its decision was made only after an analysis had been made by its News Department of all previous coverage of this topic by the network. Based on this analysis ABC deemed it necessary to give additional time to DNC.

In a letter sent to Senator Robert Dole, Chairman of RNC, Leonard H. Goldenson, president of ABC wrote that:

> [ABC is] denying the request of both the Republican and Democratic National Committees for detailed reports and logs of our coverage of the issue under discussion. As we previously indicated, our News Department carefully analyzed all the material relating to this coverage and concluded in good faith, and based upon their professional judgment, that opportunity should be given Democratic spokesmen to express their opinions on a limited issue. The Fairness Doctrine requires us as responsible broadcasters to exercise that good faith judgment on programs, formats and spokesmen for presentation of contrasting views, and that we have done. We do not believe that those who disagree with that judgment have a blanket right of access to ABC News' coverage logs and we do not intend to initiate such a practice.

(J.A. 92–93.) Goldenson's letter continued by stating that

> [W]e are convinced that our News Department exercised good faith and made a careful and thorough analysis of all the coverage previously given the issue over ABC's Television Network and concluded that, on an overall basis, the opportunity for the time we have allotted should be given to spokesmen for the DNC. We reiterate the good faith of that exami-

nation and we support the judgment of ABC News.

(J.A. 94.)

The DNC broadcast actually took place on April 22, 1971. Six senators, all serious contenders for their party's nomination and Chairman O'Brien, appeared to discuss the issue of the war. In his closing remarks O'Brien characterized the views expressed by each of the six as the views of the Democratic Party. After this broadcast RNC renewed its request lodged with ABC to represent the views of the Republican Party. RNC made its request contending that ABC had transformed the issue into a " 'DNC v. RNC' issue." (J.A. 107.) In its final argument in this request, RNC inquired as to whether in making its determination of fairness of coverage of the war ABC included time given to Administration opponents on non-News Department shows, e. g., the Dick Cavett Show, and if not, why these programs were excluded. ABC refused this request as well and contended that the network had presented "virtually every significant viewpoint on this highly controversial issue." (J.A. 109.) RNC then sought review of ABC's refusal by the Commission asserting that ABC's ruling was unreasonable. RNC made it clear from the outset that its claim was based on traditional fairness doctrine standards and noted that it was not seeking time to reply to DNC under the political spokesman doctrine. Again RNC raised the issue of appearances on non-news shows by those opposed to the Administration's Indochina policy. Since ABC failed to respond to RNC's earlier inquiry RNC urged the Commission to compel ABC to provide "any logs and other documents which would show the time used on ABC during the period February 8 to April 8, 1971, for the discussion of various viewpoints on the Indochina issue." (J.A.

79.) RNC contends that this information would have made it possible to discern whether ABC had erred in failing to consider its non-news coverage.

In its opinion in this case, the Commission considered not only RNC's request for a ruling but also the complaints of DNC against the three networks. While RNC in its complaint had expressly stated that "[we] wish to make clear that we are *not* invoking any right of *access* by particular *speakers* to television, such as is involved in . . . the political spokesman doctrine" the Commission in its decision, nevertheless stated that RNC "sought to apply Zapple,[1] Committee for Fair Broadcasting[2] and Republican National Committee[3] to the April 22 broadcast of Democratic spokesmen on ABC. . . ." FCC 71–882 at 7, (A. 136.) The Commission then held that these decisions, which formulated and applied the political spokesman corollary to the Fairness Doctrine, were inapplicable in the instant case because ABC had exercised journalistic supervision over the DNC broadcast in contrast to the situation presented in Republican National Committee.

(RNC Br. at 7, emphasis in original, footnotes renumbered.)

In its evaluation of ABC's coverage of the war issue the FCC stated that the fairness doctrine does not require precisely equal time for contrasting viewpoints and concluded that ABC was acting within its sound discretion in granting time to DNC although ABC itself stated that prior to granting time to DNC its coverage had been fair and balanced. The Commission did not reach the issue of whether ABC neglected a significant viewpoint, *i. e.*, the viewpoint of the Republican Party *qua* party.

1. Letter to Nicholas Zapple, 23 F.C.C.2d 707 (1970).

2. Committee for the Fair Broadcasting of Controversial Issues, 25 F.C.C.2d 283 1970.

3. Republican National Committee, 25 F.C.C.2d 739 (1970), reversed *sub nom.* C.B.S. v. F.C.C., 147 U.S.App.D.C. 175, 454 F.2d 1018 (1971).

In addition the FCC refused to require ABC to produce logs, documents or other records. It was the Commission's finding that RNC "offered no evidence that ABC failed to present contrasting views in other programs" and that "it would be unreasonable to require licensees to disprove allegations which lack specific and detailed evidence of failure to comply with the fairness doctrine." (J.A. 138.) The Commission made no finding as to whether ABC had considered non-news programming in making its evaluation.

## C. Decision of the Commission

The Commission began by undertaking consideration of application of the political party doctrine contained in Zapple, *supra,* and Republican National Committee, *supra,* to the facts in the cases at bar. As the Commission noted those cases established the proposition that when one political party or group is given time on the media to use at its discretion a request by an opposing party for time cannot be refused. The Commission explained that air time given to the President, at a time when he is not a candidate for re-election is not subject to the "political party" doctrine. Republican National Committee, *supra,* 25 F.C.C.2d at 744. We believe that the first paragraph of discussion in the Commission's decision bears reprinting in full.

> We shall first deal with the argument that the President's appearances fell within the holdings of Zapple and Republican National Committee on the grounds that they were partisan in nature. The Commission specifically stated in Republican National Committee, at 744, that "Presidential appearances (other than as a candidate for re-election, when of course 'equal opportunities' would be applicable . . .) do not come within the 'political party' [Zapple] doctrine." Thus, we do not feel that the Zapple ruling or its application in Republican

> National Committee should be applied to any of the Presidential appearances that are the subjects of the complaints before us. We feel that to extend Zapple or Republican National Committee to Presidential appearances would be wholly inappropriate. Presidents and other public officials (*e. g.,* Governors, mayors) do report to the public, and such reports, as we have said, contribute to an informed citizenry. Of course, the officials in such reports are most often engaged in setting forth the wisdom of the particular actions on which the reports are given. But this does not mean that this is a political party appearance to which given equal opportunities "is applicable." If that were so, the Commission would have, in effect, amended the Communications Act to specify that equal opportunities applies to all appearances of public officials. The Act, we believe, makes clear that it is fairness—not equal opportunities—which should govern here; and in any event, we believe it sound policy, for the reasons set forth in the Fair Committee ruling, that this situation—appearances of public officials during nonelection periods—should come under the fairness doctrine with respect to controversial issues covered. The Zapple ruling thus remains applicable to time given to the political parties for their use as they see fit. Republican National Committee, *supra.*

(J.A. 135–136, emphasis in original, footnote omitted.) The Commission noted that by the terms of its earlier opinion in Committee for Fair Broadcasting, *supra,* RNC's request for equal treatment by ABC was beyond the requirements of the law.[4] The Commission distinguished the two cases on the fact that here ABC had exercised firm control in assuring that DNC's response would be directly to the President's appearances and that time would not be provided for the use of a political party

---

4. *See* Ruling (E). Committee for Fair Broadcasting, *supra,* at 299–301.

*qua* party. "[T]he licensee [had] exercis[ed] its discretion under the fairness doctrine to choose appropriate spokesmen to discuss contrasting views on controversial issues of public importance." (J.A. 136.) By the same token, it would be a discretionary matter for ABC to decide if it should select or reject RNC as an appropriate spokesman on a controversial issue.

The Commission then turned to a consideration of whether the general principles of the fairness doctrine had been complied with in this case. It concluded, after considering the programming of the channels in view of the DNC and RNC complaints, that there had been an adequate opportunity for a full and reasonable discussion of contrasting viewpoints of controversial issues.

In dealing with RNC's contention that it failed to receive equitable treatment from the networks, under the dictates of the fairness doctrine, the Commission made it clear that "precisely 'equal time' [was not required]." (J.A. 138.) The Commission stated:

> We should add that, in terms of prime time coverage of the Indochina war, there is no evidence that any of the networks has failed to afford reasonable opportunities for the presentation of contrasting views. We do not accept the RNC position that because ABC thought its overall programming was "fair and balanced" before it granted the DNC request for time to respond to the President's April 7 address, it could not be balanced after the request was granted. The fairness doctrine does not require that precisely "equal time" be given to contrasting views (Committee for Fair Broadcasting, *supra*, at p. 297); only that reasonable opportunity be afforded for their presentation in the licensee's overall programming. Under the doctrine, the licensee also is given great discretion in meeting its obligations. (Fairness Primer, 40 FCC 598 (1964)). Therefore, presentation by ABC of one additional broadcast on an issue which had been

the subject of many other broadcasts occupying large amounts of time cannot be said, in and of itself, to have created an additional obligation to present still another broadcast on the opposite side. ABC clearly acted within its discretion.

(J.A. 138.) After disposing of the fairness doctrine complaints for lack of merit the Commission denied DNC's request for an evidentiary hearing and denied the RNC request for production of logs, documents and other data.

II. The Fairness Doctrine

It is not necessary for us to undertake a lengthy study of the fairness doctrine from its historical perspective as this has recently been done most comprehensively by the Supreme Court. *See* Red Lion Broadcasting Co. v. F. C. C., 395 U.S. 367, 375–386, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). As this court noted in Green v. F. C. C., 144 U.S.App.D.C. 353, 357, 447 F.2d 323, 327 (1971) the doctrine has most recently been elaborated on by the FCC in response to the Supreme Court's decision in *Red Lion.* In In re Obligations of Broadcast Licensees Under the Fairness Doctrine, 23 F.C.C.2d 27, 28 (1970) the Commission stated:

> The fairness doctrine was evolved as a policy under the public interest standard in a series of cases, given its definitive policy statement in the Commission's 1949 Editorializing Report (13 F.C.C. 1246), and codified into the Communications Act of 1959. See Section 315(a) 47 U.S.C. 315(a); Red Lion Broadcasting Company, Inc. v. Federal Communications Commission, *supra.* It requires the broadcast licensee to afford reasonable opportunity for the discussion of conflicting viewpoints on controversial issues of public importance. The Commission early determined that if the fairness doctrine were to achieve its most salutary purpose, an affirmative obligation in this respect must be imposed upon the licensee. . . .

\*     \*     \*     \*     \*     \*

The Commission's general approach to this facet of the fairness doctrine is set forth in a 1964 ruling. Letter to Mid-Florida Television Corporation, 40 F.C.C. 620, 621 (1964):

> . . . The Commission does not seek to establish a rigid formula for compliance with the fairness doctrine. The mechanics of achieving fairness will necessarily vary with the circumstances, and it is within the discretion of each licensee, acting in good faith, to choose an appropriate method of implementing the policy to aid and encourage expression of contrasting viewpoints. Our experience indicates that licensees have chosen a variety of methods, and often combinations of various methods. . .

The importance of the fairness doctrine is neither academic nor is it an administrative nicety. As the Commission stated: "The keystone of the fairness doctrine and of the public interest is the right of the public to be informed —to have presented to it the 'conflicting views of issues of public importance.' " Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 29 Fed.Reg. 10416, 10418, 40 F.C.C. 598, 604 (1964). *See also* Letter to Cullman Broadcasting Co., 40 F.C.C. 576 (1963). The need for the doctrine is apparent to even the least initiated after considering that broadcast frequencies are indeed limited and "they have been necessarily considered a public trust. Every licensee who is fortunate in obtaining a license is mandated to operate in the public interest and has assumed the obligation of presenting important public questions fairly and without bias." S.Rep.No.562, 86th Cong., 1st Sess. 9 (1959). The importance of the doctrine is evident and it is the manifest intention of the Commission to maintain it as a viable instrument in protecting the right of the public to be fully informed on controversial issues.[5]

By its very nature the fairness doctrine is one which cannot be applied with scientific and mathematical certainty. There is no formula which if followed will assure that the requirements of the doctrine have been met. Procedurally, the doctrine can only succeed when the licensee exercises that discretion upon which he is instructed to call upon in dealing with coverage of controversial issues.

> [T]he licensee, in applying the fairness doctrine, is called upon to make reasonable judgments in good faith on the facts of each situation—as to whether a controversial issue of public importance is involved, as to what viewpoints have been or should be presented, as to the format and spokesmen to present the viewpoints, and all the other facets of such programming.

Applicability of the Fairness Doctrine, *supra*, 29 Fed.Reg. at 10416, 40 F.C.C. at 599. The Commission has indicated that it will exercise substantial restraint in this area.

5. On June 9, 1971 the Commission adopted a Notice of Inquiry In the Matter of the Handling of Public Issues Under the Fairness Doctrine and the Public Interest Standards of the Communications Act, 30 F.C.C.2d 26 (1971). In the words of the Commission:

The purpose of this Notice is to institute a broad-ranging inquiry into the efficacy of the fairness doctrine and other Commission public interest policies, in light of current demands for access to the broadcast media to consider issues of public concern. It is important to stress that we are not hereby disparaging any of the ad hoc rulings that we have made in these areas. Rather, we feel the time has come for an overview to determine whether the policies derived largely from these rulings should be retained intact or in lesser or greater degree, modified. . . . Interested parties may address [any aspect of the problem.]

Thus, it is clear that the Commission is seeking to maintain the efficacy of the doctrine while guaranteeing adequate access to the public on controversial issues. It is encouraging to note that the Commission has sought widespread in-put in formulating its thinking in this crucially important area.

In passing on any complaint in this area, the Commission's role is not to substitute its judgment for that of the licensee as to any of the above programming decisions, but rather to determine whether the licensee can be said to have acted reasonably and in good faith. There is thus room for considerably more discretion on the part of the licensee under the fairness doctrine than under the 'equal opportunities' requirement.

*Id.*[6] In the exercise of its discretion the broadcaster must be mindful that Congress did not intend the doctrine to work as a mode of suppressing the broadcast of controversial views. Its intention was rather to "[require] the expression of all conflicting views on issues of public importance." Loevinger, Free Speech, Fairness and Fiduciary Duty in Broadcasting, 34 Law and Contemp. Prob. 278, 285 (1969).

Nowhere has the duty of the broadcaster under the fairness doctrine been described better than by the Supreme Court in *Red Lion.*

> The broadcaster must give adequate coverage to public issues, . . . and coverage must be fair in that it accurately reflects the opposing views. . . . This must be done at the broadcaster's own expense if sponsorship is unavailable. . . . Moreover, the duty must be met by programming obtained at the licensee's own initiative if available from no other source.

Red Lion Broadcasting Co. v. F. C. C., *supra,* 395 U.S. at 377–378, 89 S.Ct. at 1800.

It is not necessary for us to undertake a lengthy discussion of all of the cases decided under the fairness doctrine for us to dispose of petitioners' claims in this case. A reading of *Red Lion* and several of our recent opinions in this area makes it clear that there has been no violation by the Commission in dealing with the petitioners' fairness doctrine complaints.

■ The *Red Lion* litigation was borne of a dispute originally before this court. Red Lion Broadcasting Co. v. F. C. C., 127 U.S.App.D.C. 129, 381 F.2d 908 (1967), affirmed 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969). The case involved the right of reply to a personal attack broadcast over the petitioner station. The Commission held that the broadcaster was in breach of his obligation under the doctrine as espoused in Times-Mirror Broadcasting Co., 24 P. & F. Radio Reg. 404 (1962), which required that a tape, transcript or summary of the broadcast containing the attack be sent to the wronged party and that an offer of reply time be made to him. It required the station to provide such reply time regardless of whether the wronged party would pay for it. We held the Commission's position to be constitutional and affirmed. 127 U.S.App.D.C. 129, 381 F.2d 908 (1967). As the Supreme Court points out, the personal attack rule developed shortly after the *Red Lion* litigation commenced. This provision, 47 C.F.R. § 73.123 (1971), is set out in the margin.[7] The Supreme Court held that the application of the personal attack corollary to the fairness doctrine

6. This same general theme was espoused by the Commission much earlier in Editorializing by Broadcast Licensee, 13 F.C.C. 1246 (1949):

> It should be recognized that there can be no one all embracing formula which licensees can hope to apply to insure the fair and balanced presentation of all public issues. Different issues will inevitably require different techniques of presentation and production. The licensee will in each instance be called upon to exercise his best judgment and good sense in determining what subjects should be considered, the particular format of the programs to be devoted to each subject, the different shades of opinion to be presented, and the spokesman for each point of view.

*Id.* at 1251.

7. § 73.123 *Personal attacks; political editorials*

(a) When, during the presentation of views on a controversial issue of public importance, an attack is made upon the honesty, character, integrity or like personal qualities of an identified person or group, the licensee shall, within a rea-

and the promulgation of the enforcement provisions was both valid and constitutional and they enhanced, rather than abridged, the First Amendment freedoms of speech and press. Red Lion Broadcasting Co. v. F. C. C., *supra*, 395 U.S. at 375, 89 S.Ct. 1794. Speaking specifically to the constitutional issue, the Court said:

In terms of constitutional principle, and as enforced sharing of a scarce resource, the personal attack and political editorial rules are indistinguishable from the equal-time provision of § 315, a specific enactment of Congress requiring stations to set aside reply time under specified circumstances and to which the fairness doctrine and these constituent regulations are important complements. That provision, which has been part of the law since 1927, [Radio Act of 1927] § 18, 44 Stat. 1170, has been held valid by this Court as an obligation of the licensee relieving him of any power in any way to prevent or censor the broadcast, and thus insulating him from liability for defamation. The constitutionality of the statute under the First Amendment was unquestioned. Farmers Educ. & Coop. Union v. WDAY, 360 U.S. 525, [79 S.Ct. 1302, 3 L.Ed.2d 1407] (1959).

*Id.* at 391, 89 S.Ct. at 1807, (footnote omitted). Consistently, it has been held that unless the facts call for equal time under the personal attack corollary or the "equal opportunities" doctrine of 47 U.S.C. § 315 (1964) the fairness doctrine in no way requires equal time. The doctrine solely calls for a determination of whether the licensee has given sufficient opportunity for contrasting viewpoints to be heard on controversial issues of public importance. "The critical issue is whether the sum total of the licensee's efforts, taking into account his plans when the issue is a continuing one, can be said to constitute a reasonable opportunity to inform the public on the contrasting viewpoint—one that is fair in the circumstances." Committee

---

sonable time and in no event later than one week after the attack, transmit to the person or group attacked (1) notification of the date, time and identification of the broadcast; (2) a script or tape (or an accurate summary if a script or tape is not available) of the attack; and (3) an offer of a reasonable opportunity to respond over the licensee's facilities.

(b) The provisions of paragraph (a) of this section shall not be applicable (1) to attacks on foreign groups or foreign public figures; (2) to personal attacks which are made by legally qualified candidates, their authorized spokesmen, or those associated with them in the campaign, on other such candidates, their authorized spokesmen, or persons associated with the candidates in the campaign; and (3) to bona fide newscasts, bona fide news interviews, and on-the-spot coverage of a bona fide news event (including commentary or analysis contained in the foregoing programs, but the provisions of paragraph (a) of this section shall be applicable to editorials of the licensee).

NOTE: The fairness doctrine is applicable to situations coming within (b) (3), above, and, in a specific factual situation, may be applicable in the general area of political broadcasts (b) (2), above. See, section 315(a) of the Act, 47 U.S.C. 315(a); Public Notice: Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 29 F.R. 10415. The categories listed in (b) (3) are the same as those specified in section 315(a) of the Act.

(c) Where a licensee, in an editorial, (i) endorses or (ii) opposes a legally qualified candidate or candidates, the licensee shall, within 24 hours after the editorial, transmit to respectively (i) the other qualified candidate or candidates for the same office or (ii) the candidate opposed in the editorial (1) notification of the date and the time of the editorial; (2) a script or tape of the editorial; and (3) an offer of a reasonable opportunity for a candidate to respond over the licensee's facilities: *Provided, however,* That where such editorials are broadcast within 72 hours prior to the day of the election, the licensee shall comply with the provisions of this paragraph sufficiently far in advance of the broadcast to enable the candidate or candidates to have a reasonable opportunity to prepare a response and to present it in a timely fashion.

for the Fair Broadcasting of Controversial Issues, 25 F.C.C.2d 283, 295 (1970). *See also* Letter to Nicholas Zapple, 23 F.C.C.2d 707 (1970).

In recent months this court has had at least four cases dealing in one respect or another with the fairness doctrine.[8] In the first of these cases, involving requests for time to counter military enlistment commercials on the media, Judge Wilkey wrote that the doctrine did not require identical treatment for differing viewpoints of controversial issues, "as this would place an onerous and impractical burden on the licensees." Green v. F. C. C., *supra*, 144 U.S.App. D.C. at 358, 447 F.2d at 328. In addition we made it clear that unlike those corollaries to the doctrine that create equal-opportunities situations the doctrine itself does not create a right for any person or group to be granted time. "[T]he licensees may exercise their judgment as to what material is presented and by whom. . . . The fairness doctrine is issue-oriented, and it would be sufficient if each licensee could show that the point of view advocated by petitioner . . . had been or was being presented on its station by others." *Id.* In our opinion in Business Executives' Move for Vietnam Peace v. F. C. C., *supra*, we held that "[u]nder the permissive 'reasonableness' standard of the fairness doctrine, acceptance of [a] particular format is by no means compulsory." *Id.*, at 187 of 146 U.S.App.D.C., at 648 of 450 F.2d Thus, in opinion after opinion, the Commission and the courts have stressed the wide degree of discretion available under the fairness doctrine and we have clearly stated time after time, *ad infinitum ad nauseam,* that the key to the doctrine is no mystical formula but rather the exercise of reasonable standards by the licensee. *See also* Neckritz v. F. C. C., 446 F.2d 501, 502 (9th Cir. 1971).

In examining the specific complaints of petitioners in the cases at bar it is evident that the general fairness doctrine is applicable in both instances. RNC seeks a right to reply on the basis of the Commission's ruling in *Zapple.* The *Zapple* ruling created a new corollary to the fairness doctrine known as the "political party" doctrine. Letter to Nicholas Zapple, *supra*, 25 F.C.C.2d at 742–43. We have spoken to this issue most recently and have there rejected RNC's contention. Columbia Broadcasting System v. F. C. C., 147 U.S.App. D.C. 175, 454 F.2d 1018 (1971). Reason and logic teach us that an unjust result would be reached by giving one political party an opportunity to respond to a second party which had been given the opportunity to respond to the President who is a member of the first party. Any other result would be clearly erroneous. Should we grant RNC an opportunity to respond to DNC we would embark upon a course of request after request. We refuse to sanction the commencement of such an unending circle. It is somewhat more difficult to dispose of DNC's complaint. In reality DNC is asking this court, as it unsuccessfully sought from the Commission, to create a new corollary to the doctrine. They seek a ruling whereby each time a President addressed the nation the opposition party would be entitled to an "equal opportunity" under § 315(a) of the Communications Act, 47 U.S.C. § 315(a) (1964).[9] We believe this position to be an unacceptable one.

8. Green v. F.C.C., 144 U.S.App.D.C. 353, 447 F.2d 323 (1971); Business Executives' Move for Vietnam Peace v. F.C.C., 146 U.S.App.D.C. 181, 450 F.2d 642 decided August 3, 1971; Friends of the Earth and Gary A Soucie v. F.C.C., 146 U.S.App.D.C. 88, 449 F.2d 1164, decided August 16, 1971; Columbia Broadcasting System, Inc. v. F.C.C., 147 U.S. App.D.C. 175, 454 F.2d 1018, decided

November 15, 1971. The Ninth Circuit has also issued an opinion in the area recently, *see* Neckritz v. F.C.C., 446 F. 2d 501 (9th Cir. 1971).

9. *§ 315. Candidates for public office; facilities; rules*
(a) If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broad-

It has been held that addresses by the President are subject to the fairness doctrine when they concern controversial issues of public importance. Letter to Republican National Committee, 40 F.C.C. 625 (1964); Letter to Blair Clark, 11 F.C.C.2d 511 (1968). At the same time the Commission has held that "equal opportunities" do not apply to presidential addresses unless the President is a legally qualified candidate and his speech comes under one of the provisions of § 315. Committee for the Fair Broadcasting of Controversial Issues, *supra,* 25 F.C.C.2d 283. As the Commission has stated:

> We have long stressed the different manner in which "equal opportunities" and fairness requirements of Section 315 operate. The former is

casting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station: *Provided,* That such licensee shall have no power of censorship over the material broadcast under the provisions of this section. No obligation is imposed upon any licensee to allow the use of its station by any such candidate. Appearance by a legally qualified candidate on any—

(1) bona fide newscast,

(2) bona fide news interview,

(3) bona fide news documentary (if the appearance of the candidate is incidental to the presentation of the subject or subjects covered by the news documentary), or

(4) on-the-spot coverage of bona fide news events (including but not limited to political conventions and activities incidental thereto),

shall not be deemed to be use of a broadcasting station within the meaning of this subsection. Nothing in the foregoing sentence shall be construed as relieving broadcasters, in connection with the presentation of newscasts, news interviews, news documentaries, and on-the-spot coverage of news events, from the obligation imposed upon them under this chapter to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance.

10. In Committee for Fair Broadcasting, *supra,* 25 F.C.C.2d at 292, the Commission explained its reasons for supporting the doctrine:

applicable only to uses of station facilities by candidates for public office and calls for *equal* treatment—as to the amount of time to be afforded, the nature of the time slot, etc. It thus works with virtually mathematical precision.

*Id.* at 291 (emphasis in original).[10] As the Commission noted, equal opportunities for controversial issues was not the aim of Congress.

In 1959 Congress codified the fairness doctrine, by inserting the provision in Section 315(a) that broadcast licensees "must operate in the public interest and . . . afford reasonable opportunity for the discussion of conflicting views on controversial issues of public importance." The conference report makes clear that

> We do not believe that any extended discussion is needed as to why the licensee is afforded so much discretion under the fairness doctrine. In our judgment, based on decades of experience in this field, this is the only sound way to proceed as a general policy. A contrary approach of equal opportunities, applying to controversial issues generally the specific equal. opportunities requirements for political candidates would in practice not be workable. It would inhibit, rather than promote, the discussion and presentation of controversial issues in the various broadcast program formats (e. g., newscasts; interviews, documentaries). For it is just not practicable to require equality with respect to the large number of issues dealt with in a great variety of programs on a daily and continuing basis. Further, it would involve this Commission much too deeply in broadcast journalism; we would indeed become virtually a part of the broadcasting "fourth estate," overseeing thousands of complaints that some issue had not been given "equal treatment." We do not believe that the profound national commitment to the principle that debate on public issues should be "uninhibited, robust, wide-open" (New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686) would be promoted by a general policy of requiring equal treatment on all such issues, with governmental intervention to insure such mathematical equality. Footnote omitted.

this was a Congressional "restatement of the basic policy of the 'standard of fairness' which is imposed on broadcasters under the Communications Act of 1934" (H.Rep.No.1069, 86th Cong., 1st Sess., p. 5 (1959)). . . . And, finally, the Supreme Court's opinion in *Red Lion* significantly recognizes the *Editorializing Report* as the statement of the basic principles embodied in the fairness doctrine. *See Red Lion, supra,* at pp. 384–386, 89 S.Ct. 1794.

*Id.* at 293, (emphasis in original). *See generally* 67 Cong.Rec. 12502–12504. We cannot stress too strongly that this doctrine nowhere requires equality but only reasonableness.[11] "The critical issue is whether the sum total of the licensee's efforts, taking into account his plans when the issue is a continuing one, can be said to constitute a reasonable opportunity to inform the public on the contrasting viewpoint—one that is fair in the circumstances." *Id.* at 295.

One of the problems faced by DNC is the coverage given the President by the media and it is obviously because of this wide exposure they seek our creation of a new corollary. We are not unsympathetic to the plight of the party out of the White House but sympathy cannot be allowed to deter the public from the maximum information it can obtain. One of the primary sources for public information concerning the nation and its welfare is from the Presidential broadcast. While political scientists and historians may argue about the institution of the Presidency and the obligations and role of the nation's chief executive officer it is clear that in this day and age it is obligatory for the President to inform the public on his program and its progress from time to time. By the very nature of his position the President is a focal point of national life. The people of this country

look to him in his numerous roles for guidance, understanding, perspective and information. No matter who the man living at 1600 Pennsylvania Avenue is he will be subject to greater coverage in the press and on the media than any other person in the free world. The President is obliged to keep the American people informed and as this obligation exists for the good of the nation this court can find no reason to abridge the right of the public to be informed by creating an automatic right to respond reposed in the opposition party. In matters which are non-political the President's status differs from that of other Americans and is of a superior nature. Of course, as a candidate the President is subject to the same terms of § 315 as apply to other candidates. Some will proffer that a first term President is involved in his political re-election campaign from the date of his inauguration, however, we believe that adoption of this view would only serve to frustrate the ability of the President and the licensees to present authoritative Presidential reports to the public. The burden is, of course, to distinguish between the President *qua* President and the President in his political capacity. This burden must fall to the Commission in ruling on requests such as that filed by DNC.

■  In examining the broadcasts to which DNC seeks the right of reply we feel that it is not possible to give any encouragement to DNC for the position it has espoused. The first broadcast to which DNC seeks to reply was the March 15, 1971 interview by Barbara Walters on NBC's "Today" show. The interview centered on the President's family life, his public career and his family, and the role Mrs. Nixon plays in his decision making process. He also spoke of the achievements of his Administration as compared to those of previous Adminis-

---

11. In fact, equality will not always be sufficient in response to a controversial issue. In a personal attack situation a 10 second statement that a party was a fascist or communist might require that more than 10 seconds be given to the party attacked to explain and refute the representation.

trations.[12] We can find no justification for granting DNC, or any other spokesman, a right to reply to this type of personal interview of a noncandidate. As the leader of the American people, his life and that of the members of his family is a topic of great interest to a large segment of the population. People are interested in the President as a person and appreciate the intimate glance into his private life afforded by such interviews as this.

■ The second program to which DNC seeks to reply is "A Conversation With the President," an hour-long interview of the President by Howard K. Smith on ABC. The interview took place on March 22, 1971.[13] While this program did not delve into the personal life of the President, it did extensively consider his program and the rationale for some of his more important actions and decisions. The President is expected to consent to such interviews from time to time and is not expected to isolate himself from the media. This is essential in a free society. To the extent that the President's interview dealt with controversial issues of public importance it comes within the bounds of the fairness doctrine. It is not, however, for either the Commission or this court to encroach upon the discretion of the licensee in absence of an apparent abuse of this discretion. See Letter to Republican National Committee, supra; Letter to Blair Clark, supra. Should the licensee in good faith be satisfied that its broadcasting has created a reasonable balance and opportunity for opposing views to be heard on controversial issues, then there is no prima facie reason for Commission action. Should the licensee feel that there is an imbalance in its programming then it is obliged by the terms of this doctrine to seek out and create balanced coverage in controversial areas. By virtue of the very nature of the fairness doctrine there must be substantial voluntary good-faith compliance by the licensees. The record before us is bare of any suggestion to the contrary.

■ The final presentation challenged by DNC is the President's address to the nation of April 7, 1971 on the war in Southeast Asia. This speech was broadcast simultaneously on all three major networks on both radio and television. In response to DNC's request for time only ABC allowed time to respond and broadcast "Indochina: Another View" on April 22, 1971. As NBC and CBS felt their coverage of the war issue was a balanced one, they rejected DNC's request. Again, in the absence of a clear showing of abuse of discretion we have no justification for compelling reversal of these positions. As we have previously noted RNC sought to respond to this presentation but ABC refused to grant time for that purpose.

RNC contends that it represents a point of view which has not been adequately represented by others, i. e., the view of the Republican Party as a political party. It is based on this assertion that RNC seeks to respond to DNC. The DNC broadcast was permitted by ABC in fullfillment of its obligation to assure balanced coverage of a controversial issue. In the view of ABC's management DNC was a proper spokesman and "Indochina: Another View" would achieve the balanced coverage required under the doctrine. This does not intimate that following the DNC broadcast there would be imbalance and that ABC would be required to seek balance by issuing time to RNC. The requirement of mathematical equality is non-existent in this situation. Committee for Fair Broadcasting, supra, 25 F.C.C.2d at 292. In addition, we believe that RNC's position is somewhat naive. It is apparent that the President, while not officially a spokesman of RNC, is the titular leader of his party and that his program, policies and

---

12. These latter topics unquestionably are subject to the traditional requirements of the fairness doctrine.

13. See page 894 for a description of the broadcast.

achievements are those of his party. More often than not, the views of the President and of the RNC are likely to coincide.[14]

III. The Request for Network Logs

██ RNC complained that ABC failed to take all of its programming into consideration in determining whether it had indeed complied with the requirements of the fairness doctrine. Specifically, RNC questions whether ABC had taken its non-news programming into consideration, e. g., appearances by anti-war spokesmen on the Dick Cavett show. As ABC did not reply to RNC's inquiry on this subject, RNC made a formal request of the Commission to compel ABC to provide

> any logs and other documents which would show the time used on ABC during the period February 8 to April 8, 1971, for the discussion of various viewpoints on the Indochina issue. This would make possible a determination of whether ABC has made a substantial error in fixing the balance of conflicting viewpoints.

(J.A. 79.) The Commission refused this request on the grounds that program logs are not required to be made available to the public. (J.A. 138).[15] The Commission has described the evidentiary burdens on the complaining party who alleges violation of the doctrine.

> Absent detailed and specific evidence of failure to comply with the requirements of the fairness doctrine, it would be unreasonable to require licensees specifically to disprove allegations such as those made here. The Commission's policy of encouraging robust, wide-open debate on issues of public importance would in practice be defeated if, on the basis of vague

and general charges of unfairness, we should impose upon licensees the burden of proving the contrary by producing recordings or transcripts of all news programs, editorials, commentaries, and discussion of public issues, many of which are treated over long periods of time. Accordingly although the Commission intends also to employ other appropriate procedures to insure compliance by licensees with the fairness doctrine (e. g., in-depth spot checks at renewal time), it has long been our policy normally to require that fairness doctrine complaints (a) specify the particular broadcasts in which the controversial issue was presented, (b) state the position advocated in such broadcasts, and (c) set forth reasonable grounds for concluding that the licensee in his overall programming has not attempted to present opposing views on the issue. See Applicability of Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 29 F.R., 10415 (1964).

Allen C. Phelps, 21 F.C.C.2d 12, 13 (1969). This court has deemed these requirements to be a "not unreasonable standard." Hale v. F.C.C., 138 U.S.App. D.C. 125, 128, 425 F.2d 556, 559 (1970). We endorse the reasoning of the Commission as expressed in Robert G. Ryan, 25 F.C.C.2d 884, 885 (1970):

> [I]f the Commission were to require stations or networks to come forward with specific evidence such as tapes or transcripts of programs each time someone raised a fairness question regarding someone such as the Vice-President, who by the nature of his office appears regularly on the media stating and discussing his views and

---

14. *See generally* C.B.S. v. F.C.C., *supra.*

15. Under the terms of the Communications Act of 1934 the Commission is empowered to require individual licensees "to keep such records of programs . . . as [the Commission] may deem desirable." 47 U.S.C. § 303(j) (1964). Based upon this statutory prescription the FCC requires that the licensee maintain logs of

programs broadcast over the licensee's facilities in a certain form. 47 C.F.R. §§ 73.669(c), 73.670 (1971). These logs are usually retained for two years and must be made available to authorized Commission staff upon request. 47 C.F. R. §§ 73.673, 73.674 (1971). There requirements do not extend to the networks, however, only to the licensees.

philosophies on the problems facing the country, the burden so cast on the stations and networks would be most onerous and would substantially discourage the normal day-to-day presentation of broadcasts.

This court finds itself at a loss in attempting to determine why ABC should be compelled to present the documents and logs requested. The opinions of the Commission are clearly apposite and we have held the Commission standard to be a reasonable one. Hale v. F.C.C., *supra*. In addition, as we have pointed out in footnote 15, *supra*, there is no obligation on the network to maintain logs, *only* the licensee. We cannot require presentation of logs which there is no obligation to maintain. The most curious matter, however, is why we should compel production of information already in the hands of RNC. ABC responded to an earlier DNC complaint on April 29, 1971. This response was available to RNC and answered all of the questions presented including those with reference to the Dick Cavett Show. We set out the ABC response in the margin.[16] Finally, in a letter to RNC ABC asserted that in determining the fairness of its coverage of the war issue there was "a careful and thorough analysis of *all* the coverage previously given the issue over ABC's Television Network." (J.A. 63, 94; emphasis added.) There is no reason to order production of either logs or other documents.

## IV. DNC's First Amendment Assertions

■ DNC makes two major claims relating to the First Amendment. They first contend that the FCC has construed the fairness doctrine in such a way as to deny them the relief sought. DNC argues that this construction is inconsistent with the First Amendment. The second claim is that the procedures used by the Commission in processing complaints under the fairness doctrine are inadequate to protect those rights guaranteed by the First Amendment. We have given both of these contentions careful consideration but for the reasons

16. As the DNC is no doubt aware, ABC has covered the War in Southeast Asia on a continuing and balanced basis for the past ten years, and during that period virtually every significant viewpoint on this issue has been presented over ABC's facilities. Since President Nixon's election, ABC has repeatedly presented not only the President's views but also those of Democratic critics of his policies. For example, during the period February 8 through March 27, 1971, approximately 11½ minutes in ABC's "Evening News" and "Weekend News" programs were devoted to views which differ from the Administration's position and policies in Indochina. During this same period, approximately 15½ minutes in these newscasts presented views which favored the Administration's position and policies. Between March 28 and April 11, 1971, almost twelve minutes in regular ABC newscasts were devoted to views critical of the Administration's course of action and policies in Indochina, while approximately 4 minutes were devoted to viewpoints in support of Administration policies on this issue.

The War in Southeast Asia has also been discussed extensively on ABC's ISSUES AND ANSWERS in recent months. Several individuals, including Admiral Zumwalt on January 17 and Admiral Moorer on March 14, have supported Administration policies on broadcasts in this series. In addition, the following guests have appeared on ISSUES AND ANSWERS since January 1, 1971 and have presented views differing from those held by the Administration on the war issue at length: February 7, Senator Edmund Muskie (D-Maine); February 14, Representatives Shirley Chisholm (D-New York) and Ronald Dellums (D-California); March 21, Senator George McGovern (D-South Dakota); April 4, Senators John Sherman Cooper (R-Kentucky) and Frank Church (D-Idaho).

Although the DICK CAVETT SHOW is not under the supervision of ABC News, varying viewpoints in relation to the Indochina War have also been presented in this series. Guests appearing on this show since January 1, 1971, including both supporters of the Administration's policies in Southeast Asia as well as those who differ from the President's approach to the War, have expressed a broad range of divergent opinion on this subject. J.A. 55.

set out below we are forced to reject them.

There is no disagreement with the proposition that "broadcasting is clearly a medium affected by a First Amendment interest." Red Lion Broadcasting Co. v. F.C.C., *supra,* 395 U.S. at 386, 89 S.Ct. at 1805. Despite this recitation we have not yet reached the stage of being able to determine with any surety precisely the scope of the First Amendment's impact on the broadcast media.[17] The opinion of the Supreme Court in *Red Lion* is the definitive holding with reference to First Amendment freedoms and the broadcast media. According to the Court in that case, the primary concern in the broadcast industry is "the First Amendment goal of producing an informed public capable of conducting its own affairs." Red Lion Broadcasting Co. v. F.C.C., *supra,* 395 U.S. at 392, 89 S.Ct. at 1807. In light of the fact that there are only a limited number of broadcast frequencies available for private use[18] the interests of the public are further enhanced.

[T]he people as a whole retain their interest in free speech by radio and their collective right to have the medium function consistently with the ends and purposes of the First Amendment. It is the right of the viewers and listeners and not the right of the broadcasters which is paramount. . . It is the right of the public to receive suitable access to social, political, esthetic, moral, and other ideas and experiences which is crucial here.

*Id.* at 390, 89 S.Ct. at 1806.

The crux of the DNC First Amendment allegations is that the President, by the virtue of his position, is capable of dominating the broadcast media at will and can prescribe the scope, focus and content of national debate on the major issues of the day. "When the President enjoys unfettered access to television and an effective right to respond is denied, there is a very real danger that such domination will come about by default." (DNC Br. at 34.) DNC further contends that it will only be the voice of the President that is heard clearly and that

---

17. Judge Wright made this clear in the following excerpts from his opinion in Business Executives' Move for Vietnam Peace v. F.C.C., 146 U.S.App.D.C. 181 at 188, 450 F.2d 642, at 649, (1971):

> It has always been clear that the broadcast media—so vital to communication in our society—are affected by strong First Amendment interests.[10] Yet the
>
> > 10. *See e. g.,* United States v. Paramount Pictures, Inc., 334 U.S. 131, 166, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). Congress itself has prohibited any interference by the Commission with "the right of free speech by means of radio communication." 47 U.S.C. § 326 (1964).
>
> nature of those interests has not been so clear; an evolution of constitutional principles in this area is still very much in progress.
>
> [*Red Lion*] justified the Commission's interference with broadcasters' free speech by invoking specifically constitutional rights of the general public which, it said, underlie and support the fairness doctrine rules at issue. Issuing what must become a clarion call for a new public concern and activism regarding the broadcast media, the Court stated that "the people as a whole

retain their . . . collective right to have the medium function consistently with the ends and purposes of the First Amendment.[11] It went on to

> 11. 395 U.S. at 390, 89 S.Ct. 1794.

say:

> " . . . The right of free speech of a broadcaster . . . does not embrace a right to snuff out the free speech of others. . . .
>
> \* \* \* \* \*
>
> . . . [A] licensee has no constitutional right . . . to monopolize a radio frequency to the exclusion of his fellow citizens. . . .
>
> \* \* \* \* \*
>
> . . . It is the right of the viewers and listeners, not the right of the broadcasters, which is paramount.[12]

> 12. Id. at 387, 389, 390, 89 S.Ct. 1794.

450 F.2d at 649–650.

18. This was recognized by the Supreme Court early in the history of public broadcasting. For an interesting exposition see Mr. Justice Frankfurter's opinion in National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943).

the public will not be permitted exposure to opposing viewpoints thereby depriving the public of its rights to be an informed electorate. DNC continues by seeking an automatic right to respond to the President since it is their feeling that only by right of access to the media can DNC reach the vast audience that television makes available.

> [DNC] was seeking equality with the President in exercising its right to speak, and speak effectively, on issues affecting the conduct of government. Denial of the right is a matter of First Amendment concern. . . . But petitioner was seeking to do more than exercise a right. It was also attempting to carry out its responsibility as one of the two major political parties to define the options open to the American people on major public issues. In this sense, petitioners' assertion of its rights was co-extensive with the public's First Amendment right of access to all viewpoints on public questions.

(DNC Br. at 35.) DNC insists that the Commission's ruling infringes upon protected First Amendment rights. We believe they are mistaken. The rights protected by the First Amendment are designed to insure an open forum for robust discussion. That is precisely the purpose of the fairness doctrine. No one disputes that the public has a right to be informed. That proposition is supported by the Commission, the courts, RNC, DNC, and the networks. The only question that has been raised is what must be done to insure that the public is adequately informed. DNC suggests that there be an automatic right to respond to Presidential appearances. Furthermore, they assert that as the leading party out of the White House and as the majority party in Congress they would always be an appropriate party to respond. DNC feels it is obligated to inform the nation of the viable options open to it. Should this be DNC's manifest destiny we can find no reason to compel the networks to assist it. Can it be said that others are not equally capable of the task? At times the President speaks to crucial problems to which other groups are far more qualified to speak. DNC and its representatives have no greater claim to expertise in the area of the economy than the National Chamber of Commerce or the president of the New York Stock Exchange, and that is the point; crucial issues must be reasonably aired after consideration of the viewpoints of all significant factions. This is a matter for licensee discretion and not automatic rule because the speaker is the President of the United States. If DNC were correct in their contentions this illusionary First Amendment right would extend right of response to addresses by State governors and city mayors. We believe DNC's position to be fallacious and point to our recent decision in Green v. F.C.C., *supra,* where we state that no individual or group "has the right of access to the air; the licensees may exercise their judgment as to what material is presented and by whom." 144 U.S.App. D.C. at 358, 447 F.2d at 328. There is nothing in either the First Amendment or the case law to negate this reasoning. As to the contention that without this automatic right only the voice of the President is heard clearly we can only say that while this may be a persuasive debate argument we question its validity here. Daily all of the media—not merely broadcast media—carry stories, articles and reports by opponents to the President, from the opposition party as well as his own party. In this nation the varying viewpoints are available to any person seeking to hear or read them. A citizen desiring to be informed need only pick up a newspaper or news magazine, flick on his radio, or tune-in his television. Information indicative of all viewpoints is available merely for the seeking. We see no need for supplementation based on some theoretical right in the First Amendment which at best has gone undefined in this litigation.

The second set of contentions involves alleged procedural flaws which affect First Amendment rights. The alleged

procedural defects number three: (1) the time it took the FCC to issue its opinion in this case, (2) the burden of proof on petitioners under *Phelps* and (3) FCC's failure to hold an evidentiary hearing on DNC's claims.

■■ In consideration of the first matter, this court is in total agreement with DNC. The Commission should reach a disposition of all fairness doctrine complaints as swiftly as possible within the realm of responsible administrative decision-making. No one benefits by long delays in this area. However, this does not mean to imply that the Commission has committed reversible error. The FCC is charged with far more than decision of complaints emanating from the fairness doctrine. The Commission is responsible for the total scheme of regulation in the field of radio and television communication. This being the case, the Commission cannot always consider a complaint, come to a conclusion, write an opinion and prepare it for issuance as quickly as a given petitioner would like. We do not believe that the time lapse in this case served to deprive petitioners of their First Amendment rights.

■■■ The second procedural aspect which we must examine relates to the allocation of the burden of proof. We are in agreement with the Commission and the intervenor-networks that DNC has failed to preserve this issue for review by this court as it did not raise the claim before the Commission. *See* 47 U.S.C. § 405 (1964); Green v. F.C.C., *supra*, 144 U.S.App.D.C. at 359, 447 F.2d at 329. Nonetheless, even if *arguendo* DNC did preserve its claim the law on the matter is clear. The initial burden in cases emanating from a fairness doctrine complaint rests not with the licensee but with the complainant. Allen C. Phelps, *supra*.[19] Simply stated, the DNC has failed to meet that burden in this case. DNC failed to prove before court and Commission that the programming of which it complains did not meet the general requirements of the fairness doctrine.

The third procedural argument raised by DNC claimed a right to an evidentiary hearing. Let us look at the results of adopting such a rule. Presently, the Commission receives a substantial number of fairness doctrine complaints in a given year. Based on the DNC request the Commission would be forced to hold evidentiary hearings on each of these complaints, many based on insubstantial claims of unfairness. A consideration of the factual questions for such a hearing, as suggested by DNC, which we set out in the margin,[20] makes it clear that an immense burden would face both Commission and broadcaster. The current DNC complaint that four months was an undue delay would soon be replaced by much greater periods of time necessitated by

---

19. See text at p. 907.

20. DNC proposed the following questions for evidentiary hearing:
    1. How much time has each network accorded the views favoring or opposing the Administration's on the pertinent controversial issues of public importance during the relevant period?
    2. In what formats and under whose control have these views been presented?
    3. Is control over time and format relevant in assessing the impact of the presentations on the viewers?
    4. Which opposition spokesmen have been selected to respond to Presidential views and on what basis?
    5. What pressures, if any, has the White House exerted on the networks

to make broadcast time available to the President, to control the time and format of the programs in question, and to preclude opposition spokesmen from receiving significant amounts of air time in which to respond?
    6. What is the impact on the public of repeated Presidential broadcasts on the same subject in prime time when no direct response to these broadcasts is permitted?
    7. What types of responses are necessary or appropriate to Presidential broadcasts or a series of Presidential broadcasts to insure balanced coverage? J.A. 118. A consideration of these questions leads us to believe that DNC seeks to have the Commission exercise a journalistic discretion in place of the licensee. This is clearly impermissible.

the weeks it would take to hold the proposed evidentiary hearing. Such delay would surely have a "chilling" effect on the rights of all involved.

We find nothing in the statutory law, either in the Communications Act of 1934 or elsewhere, which would require an evidentiary hearing under these circumstances. In its *Fairness Primer* the Commission has laid out its methodology for handling complaints arising from the fairness doctrine.

If the Commission determines that the complaint sets forth sufficient facts to warrant further consideration, it will promptly advise the licensee of the complaint and request the licensee's comments on the matter. Full opportunity is given to the licensee to set out all programs which he has presented, or plans to present, with respect to the issue in question during an appropriate time period. Unless additional information is sought from either the complainant or the licensee, the matter is then usually disposed of by Commission action.

Applicability of the Fairness Doctrine in the Handling of Controversial Issues of Public Importance, 40 F.C.C. 598, 600 (1964). It is now, as it has always been, the practice of the Commission to deal with alleged violations of the fairness doctrine by written submission rather than by evidentiary hearing. Because of this informal procedure the *Red Lion* litigation came to fruition. In that case the Supreme Court said nothing to suggest that this informal procedure was an improper one.[21] We conclude, therefore, that an evidentiary hearing was not required in the case at bar.[22]

V. Conclusion

The scope of judicial review in this area was spelled out thirty years ago by Mr. Justice Frankfurter.

Our duty is at an end when we find that the action of the Commission was based upon findings supported by evidence, and was made pursuant to authority granted by Congress. It is not for us to say that the 'public interest' will be furthered or retarded by the . . . [r]egulations. The responsibility belongs to Congress for the grant of valid legislative authority and to the Commission for its exercise.

National Broadcasting Co. v. United States, *supra*, 319 U.S. at 224, 63 S.Ct. at 1013. This is our instant case. It is our belief that the findings of the Commission are supported by the evidence and are within the scope of authority promulgated by the Congress. We have carefully considered the Commission's Memorandum Order and Opinion and find that it is neither arbitrary, whimsical, or capricious.

[A] court's role is limited to deciding whether the Commission's order is unreasonable or in contravention of statutory purpose. In making such a determination a court "is not at liberty to substitute its own discretion for that of administrative officers who have kept within the bounds of their administrative power." American Tel. & Tel. v. United States, 299 U.S. 232, 236, 57 S.Ct. 170, 81 L.Ed. 142 (1936). *See generally*, K. Davis, Administrative Law Treatise 5.03 (1958).

Neckritz v. F.C.C., *supra*, 446 F.2d at 502–503.

21. Hearings are only required under the Communications Act when granting, modifying, or renewing a station's license or in granting a construction permit. 47 U.S.C. §§ 307(a), 309(e). Under the terms of the Administrative Procedure Act (APA) hearings are required only in cases "of adjudication required by statute to be determined on the record after opportunity for an agency hearing." 5 U.S.C. § 554(a). Since there is no requirement of a hearing under the Communica-

tions Act this section of the APA is clearly inapplicable. *See* Titusville Cable TV, Inc. v. United States, 404 F.2d 1187, 1192 (3rd Cir. 1968) ; Conley Electronics Corp. v. F.C.C., 394 F.2d 620, 625–626 (10th Cir.), cert. denied, 393 U.S. 858, 89 S.Ct. 127, 21 L.Ed.2d 127 (1968).

22. We have considered DNC's argument that an evidentiary hearing was required as a matter of due process, however, we dismiss it as being without merit.

DNC asks us to give birth to a new corollary. We are not the body to pass on such a request. Those who advocate the adoption of new standards have, of course, access to both the Commission and the Congress. No number of law suits can give this court a legislative authority, nor would we exercise such an authority to which we are clearly not entitled. Finding no error the Opinion of the Commission is

Affirmed.